UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JERRY DAVIS,

                              Plaintiff,

    – against –

THE CITY OF NEW ORLEANS; JASON WILLIAMS, in his official
capacity as Orleans Parish District Attorney; ANNE KIRKPATRICK,
in her official capacity as Superintendent of the New Orleans Police
Department; MELVIN WININS, in his individual capacity; and
JOHN/JANE DOES #1-20, in their individual capacities,

                              Defendants.

Case No. 24-CV-1870

**COMPLAINT**

JURY TRIAL
DEMANDED

**MURELL LAW FIRM**

Christopher J. Murell, La. Bar No. 32075
Meghan K. Matt, La. Bar No. 39975
2831 Saint Claude Avenue
New Orleans, LA 70117
(504) 717-1297 (Tel)
chris@murell.law
meghan@murell.law

**SHANIES LAW OFFICE LLC**

David B. Shanies* (T.A.)
Eleanor C. Davis*
110 West 40th Street, Tenth Floor
New York, New York 10018
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com
eleanor@shanieslaw.com

\* Application for admission *pro hac vice*
  forthcoming

*Attorneys for Plaintiff Jerry Davis*

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

NATURE OF THE ACTION ........................................................................................ 3

JURISDICTION AND VENUE ................................................................................... 4

PARTIES ....................................................................................................................... 4

JURY DEMAND .......................................................................................................... 6

FACTS ........................................................................................................................... 6

    A.  The Crime ..................................................................................................... 6

    B.  The Investigation and Jerry Davis's Arrest ............................................. 7

    C.  Jerry Davis's Trials and Conviction ...................................................... 13

    D.  Jerry Davis's Post-Conviction Proceedings and New Evidence ......................................... 24

    E.  The City of New Orleans's, NOPD's, and OPDA's Deliberate Indifference to Official Misconduct, Including *Napue* and *Brady* Violations, Fabrication of Evidence, Malicious Prosecution, and Their Failures to Train, Supervise, and Discipline Their Employees ......................................... 26

        1.  The City's, NOPD's, and OPDA's Policies, Customs, and Practices of Condoning and Encouraging Misconduct ................................... 27

        2.  The City's, NOPD's, and OPDA's Policies, Customs, and Practices of Suppressing *Brady* Information ................................................... 32

        3.  The City's and NOPD's Unlawful Policies, Customs, and Practices Concerning the Fabrication of Evidence ................................... 54

DAMAGES .................................................................................................................. 57

CAUSES OF ACTION ............................................................................................... 59

REQUEST FOR RELIEF ........................................................................................... 72

Plaintiff Jerry Davis, by his undersigned counsel, the Murell Law Firm and the Shanies Law Office LLC, as and for his Complaint against the above-named Defendants, alleges as follows:

## **INTRODUCTION**

1. Jerry Davis is a 65-year-old father and grandfather who spent over 40 years incarcerated for a murder he did not commit.

2. In January of 1984, Mr. Davis was wrongfully convicted for a 1983 murder. He was just 24 years old when he was falsely accused. By the time he was released in 2024, he had spent more than forty years in prison.

3. Mr. Davis's wrongful prosecution, conviction, and incarceration did not result from an inadvertent mistake. They were caused by Defendants' unconstitutional and tortious acts and omissions, which included fabricating evidence; suppressing exculpatory evidence;[1] providing false testimony and failing to correct false testimony; and creating and maintaining unlawful policies, customs, and practices that caused the wrongful and unconstitutional acts and omissions described in this Complaint.

4. Mr. Davis was convicted based on the testimony of two men who, as the State later acknowledged, testified falsely. The State concealed from the defense and the jury both men's criminal histories, as well as the benefits one of the men received in exchange for his testimony.

---

1. All references in this Complaint to *Brady* and/or exculpatory evidence refer to the government's obligation under the Due Process Clauses of the Fifth and Fourteenth Amendments to disclose favorable information to a criminal defendant and corresponding protections under Louisiana law. *See, e.g.*, *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006); *Kyles v. Whitley*, 514 U.S. 419, 438 (1995), *United States v. Agurs*, 427 U.S. 97, 103-07 (1976); *Giglio v. United States*, 405 U.S. 150, 155 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Wilde v. Wyoming*, 80 S. Ct. 900, 901 (1960); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Alcorta v. Texas*, 335 U.S. 28, 31 (1957); *Berger v. United States*, 295 U.S. 78, 88 (1935); La.C.Cr.P. art. 718 (A); La.C.Cr.P. art. 719 (A); La.C.Cr.P. art. 722; La. R. Prof'l Cond. 3.8; *In re Seastrunk*, 236 So. 3d 509, 510 (La. 2017) (duty to disclose under Louisiana Rules of Professional conduct is "coextensive" with *Brady* obligation).

5.      In addition, the lead detective on the case, Defendant Melvin Winins, testified at trial in a manner that was inconsistent with several police reports, including his own daily reports.

6.      Many of those reports, along with crucial physical evidence, were never disclosed to the defense.

7.      Decades later, the Innocence Project of New Orleans ("IPNO") conducted a comprehensive reinvestigation of Mr. Davis's case.  At the conclusion of that investigation, Mr. Davis filed an Application for Post-Conviction Relief with the Orleans Parish Criminal Court seeking vacatur of his conviction and dismissal of the case against him.

8.      At the July 26, 2023, hearing on this Application, Judge Tracey Flemings-Davillier dismissed Mr. Davis's convictions based on findings "that there were significant *Brady* violations" and "significant violations in terms of *Napue* violations."  Judge Flemings-Davillier reasoned that "the jury did not have the benefit of considering that information during its deliberations" and so that "Mr. Davis [was] in fact entitled to a new trial, such that all of the information [could] be presented to a jury and such that the jury would have the benefit of weighing all the information that should have been presented at the time of trial and any newly discovered evidence after the trial."  Accordingly, she vacated Mr. Davis's conviction.

9.      On March 15, 2024, the State filed a nolle prosequi motion, terminating the case in Mr. Davis's favor.

10.     Because the injustice done to Mr. Davis was committed by, among others, Defendant Winins, an employee of the NOPD, and made possible by the NOPD and OPDA's unconstitutional policies and practices, Mr. Davis has legal claims under state and federal law to remedy the massive damage he suffered due to his wrongful conviction and decades of imprisonment.

11.     Defendants' conduct caused Mr. Davis injuries and damages including bodily and personal injuries; pain and suffering; mental anguish; emotional distress; loss of liberty; loss of income and earning capacity; reputational harm; infliction of physical illness; inadequate medical care; humiliation of himself and his family; degradation; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal conduct, educational opportunity, and family relations.  These injuries began in 1983 and are ongoing in nature.

## NATURE OF THE ACTION

12.     This is an action to recover compensatory and punitive damages and other legal remedies for violations of Mr. Davis's rights secured by 42 U.S.C. §§ 1983 and 1988 and by the United States Constitution, including its Fourth, Fifth, and Fourteenth Amendments, as well as the Louisiana Constitution and State law, arising from Defendants' suppression of *Brady* information, fabrication of evidence, and presentation of false testimony to maliciously prosecute, convict, and incarcerate Mr. Davis for a crime he did not commit.

13.     The lawsuit also seeks to hold Defendants the OPDA and the City of New Orleans (the "City") liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Both the NOPD and the OPDA maintained unlawful policies, customs, and practices during Mr. Davis's investigation, arrest, and trial.  In executing those unlawful policies, customs, and practices, the NOPD and OPDA violated the constitutional rights of criminal suspects and defendants, including Mr. Davis.  In Mr. Davis's case, the unlawful policies, customs, and practices enabled Defendant Winins, and other members, servants, employees, and agents of the City and the OPDA, to violate Mr. Davis's constitutional rights.  The policymaking officials acting on behalf of the City and the OPDA were deliberately indifferent to the likelihood that their agencies' unlawful policies, customs, and practices would cause constitutional violations like Mr. Davis's.  As a result, the City and the OPDA caused and are liable for Mr. Davis's injuries.

14.     The City is likewise liable under the doctrine of *respondeat superior* for the tortious conduct of its agents and violations of the Louisiana Constitution and State law.

## JURISDICTION AND VENUE

15.     Mr. Davis brings this action under 42 U.S.C. §§ 1983 and 1988 because he alleges Defendants, acting under color of law, deprived Mr. Davis of his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

16.     This Court has original subject matter jurisdiction over Mr. Davis's federal law claims under 28 U.S.C. §§ 1331 and 1343, this being an action seeking redress for the violation of Mr. Davis's constitutional and civil rights; and supplemental jurisdiction over Mr. Davis's state law claims under 28 U.S.C. § 1367.

17.     Venue is proper in the United States District Court for the Eastern District of Louisiana under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Mr. Davis's claims occurred in this District.

## PARTIES

18.     Plaintiff Jerry Davis is a citizen of the United States and is a resident of the State of Louisiana.

19.     Defendant the City of New Orleans is and was at all relevant times a municipal corporation existing under and by virtue of the laws of the City of New Orleans and the State of Louisiana, and having the powers and duties imposed by law thereon.

20.     Defendant the City of New Orleans was at all relevant times relevant the public employer of the individual Defendants Winins and John/Jane Does #1-20 and was legally responsible for torts they committed within the scope of their employment or under the color of state law.  Defendant the City of New Orleans is also obligated under law and by contract to indemnify and defend the individual Defendants named herein.

21.     The NOPD and the OPDA are and were at all relevant times agencies of Defendant the City of New Orleans and/or Orleans Parish.  At all times relevant to this action, Defendants the City of New Orleans and Defendants Williams and Kirkpatrick and their predecessors in office, in their official capacities, by their officers, agents, servants, and employees, were responsible for the operation, maintenance, and control of the NOPD and the OPDA and for the selection, training, supervision, and discipline of police officers and prosecutors.

22.     Defendant Jason Williams is currently the Orleans Parish District Attorney, and currently responsible for the operation, maintenance, and control of the OPDA and for the selection, training, supervision, and discipline of prosecutors and other OPDA employees. Defendant Williams is sued in his official capacity.  Defendant Williams is the successor as final policymaker for the OPDA to Leon Cannizzaro, who served as OPDA's final policymaker from in or around 2008 to in or around 2020; Eddie Jordan, who served as OPDA's final policymaker from in or around 2003 to in or around 2007; Harry Connick, who served as OPDA's final policymaker from in or around 1974 to in or around 2003; and James Garrison, who served as OPDA's final policymaker from in or around 1962 to in or around 1973.

23.     Defendant Anne Kirkpatrick is currently the Superintendent of the NOPD, and currently responsible for the operation, maintenance, and control of the NOPD and for the selection, training, supervision, and discipline of police officers and other NOPD employees. Defendant Kirkpatrick is sued in her official capacity.

24.     Defendant Melvin Winins is a former officer of the NOPD.  At all relevant times, he was a duly appointed and acting officer of the NOPD employed by Defendant the City of New Orleans.  At all relevant times, Defendant Winins acted toward Mr. Davis under the color of state law and within the scope of his employment under the statutes, ordinances, regulations, policies,

customs, and practices of the State of Louisiana and the City of New Orleans.  This lawsuit seeks to hold Defendant Winins liable in his individual capacity.

25.     Defendants John/Jane Does #1-20 are employees of the NOPD or the OPDA who acted toward Mr. Davis under the color of state law and within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of Louisiana and the City of New Orleans and/or Orleans Parish; and who participated in the misconduct alleged herein; but whose actual names Mr. Davis has been unable to ascertain notwithstanding reasonable efforts to do so.  This lawsuit seeks to hold Defendants John/Jane Does #1-20 liable in their individual capacities.

## JURY DEMAND

26.     Mr. Davis hereby demands trial by jury of all issues raised in this Complaint.

## FACTS

**A.     The Crime**

27.     Around 11:25 P.M. on May 6, 1983, John and Bette Broussard, a white couple visiting New Orleans from Mississippi, pulled into a trailer lot on 6215 Chef Menteur Highway to stay the night.

28.     After parking, Mr. Broussard exited the camper to hook up electricity and water to their camper.  Mrs. Broussard remained inside the camper.

29.     While Mr. Broussard was hooking up the camper, he saw two black males approaching, whom he later described as "twenty-two years of age [and] wearing dark clothing."

30.     According to Mr. Broussard, the two men began "demanding money" from him, and then one of the perpetrators "started to enter the camper."  Mr. Broussard tried to stop the man from entering the camper "when the perpetrator shot him."

31.     Mrs. Broussard, while inside the camper, heard Mr. Broussard outside of the camper "talking to someone" and then "heard a shot."

32.     Mr. Broussard reported that, as "the other perpetrator stayed outside," the first perpetrator who "was in possession of the weapon" then "entered the camper [and] demanded his wife's purse." Mrs. Broussard reported that "immediately after the shot," one of the perpetrators entered the camper "demanding her money and purse." Mrs. Broussard gave her purse to the perpetrator in the camper.

33.     According to both Mr. and Mrs. Broussard, both perpetrators then fled on foot.

34.     Mr. Davis had nothing to do with the crime.

**B.     The Investigation and Jerry Davis's Arrest**

35.     New Orleans Police Department ("NOPD") Officers Docia LaGrange and Kenneth Maes arrived on the scene shortly after the shooting.

36.     Upon arrival, Officers LaGrange and Maes saw Mr. Broussard lying on the ground with a gunshot wound to the chest.

37.     Before paramedics arrived, Officer LaGrange spoke to Mr. Broussard and took his account of the incident, which she recorded in an initial incident report. Officer LaGrange also recorded Mrs. Broussard's account of the incident.

38.     When paramedics arrived, they administered first aid to Mr. Broussard and transported him to Methodist Hospital where he was pronounced dead around 12:30 A.M.

39.     After Mr. Broussard's death, Detective Melvin Winins of the Criminal Investigation Bureau of the NOPD was assigned to the murder case. He went to Methodist Hospital, where Officers LaGrange and Maes briefed him. Police records conflict about whether Detective Winins spoke to Mr. Broussard at this time:

a.  According to daily reports completed by Detective Winins on June 6th and 10th of 1983, Detective Winins did not interview Mrs. Broussard about the crime until June 10, 1983, over one month after the crime.  Detective Winins's daily reports indicate that when he attempted to interview Mrs. Broussard at the hospital, she was "not mentally able for an interview at this time."  Detective Winins also reported that he attempted to interview Mrs. Broussard on May 10, 1983, but she told him she was occupied with funeral arrangements and ended the interview.  Additionally, on both May 16, 1983, and May 18, 1983, Detective Winins again attempted to set an interview with Mrs. Broussard but received no response.

b.  According to a Supplemental Incident Report prepared by Detective Winins on June 21, 1983, however, Detective Winins spoke with Mrs. Broussard at the hospital, where she gave him an account of the crime and a list of property stolen from her.  According to Detective Winins, Mrs. Broussard told him that she first heard her husband's voice outside, telling someone, "you can't go in there," after which she "looked up and . . . observed a black male standing in the rear door of the camper."  That man then "picked up her purse and her wallet which were lying on the bed," and "while she and the black male were in the camper, she heard a shot."  The substance of this alleged statement was inconsistent with both Mr. and Mrs. Broussard's initial statements to Officer LaGrange.

40.  After leaving the hospital the day after the shooting, Detective Winins attempted to visit the crime scene, but he "observed that the lighting in this area was very poor."  He therefore concluded that he "could not locate a scene," nor "any evidence or witnesses."

41.     On May 9, 1983, Detective Winins spoke with Joseph Celino, who said he was parked across the street, sitting in his truck, when the shooting occurred.  Mr. Celino explained that after hearing "what sounded like two gunshots," he "looked up" and "observed two black males running from the trailer lot."

42.     Mr. Celino described the two men as twenty to twenty-five years old, one being "5 feet 8 inches tall, about 160 lbs.," and the other being "5 feet 9 inches tall, about 150 lbs."

43.     On June 6, 1983, Detective Winins, along with Detective Robert Lambert, returned to the scene to canvass the area, when they spoke with another witness, Charles Cornish.  Mr. Cornish, like Mr. Celino, described the suspects as one inch apart in height, twenty to twenty-three years of age, and 145 to 150 pounds.

44.     On June 10, 1983, more than one month after the shooting, Mrs. Broussard visited the Homicide Office to view a photo line-up.  Mrs. Broussard viewed three sets of line-ups and did not identify anyone as the perpetrator who entered her camper.  Detective Winins then took a statement from Mrs. Broussard.

45.     Recounting the incident, Mrs. Broussard said that on the evening of May 6, 1983, while her husband was hooking up the electricity to their camper, she heard voices outside, one of which was her husband saying, "you can't go in there."

46.     Soon after, she saw a "young bl[a]ck man coming toward the back door of the camper."  Mrs. Broussard described the perpetrator as five feet and ten inches to six feet tall, "medium complexioned," and about 160 to 170 pounds.  Though she tried to hold the door closed, the man entered the camper, pushed her back, and grabbed her purse and wallet.  The man then "turned around and was leaving out the door when [she] heard a shot."  This statement, taken over

one month after the initial incident, was inconsistent with her and her late husband's initial statements to police, both of which said the shot was fired *before* the man entered the camper.

47.     When Detective Winins asked whether the subject was armed, Mrs. Broussard said she "never saw a weapon."

48.     On June 21, 1983, Detective Winins and Detective Herman Cade met with Allen Johnson, a confidential informant.  Mr. Johnson stated that "he knew the two perpetrators of the murders of the white man that had been killed last month on Chef Menteur Highway."

49.     Mr. Johnson said his friend, John Phillip Ware, "had told him all about the murder while they were getting high."  Mr. Johnson gave Mr. Ware's address to the detectives.

50.     Mr. Johnson did not mention Jerry Davis when he spoke to police on June 21, 1983.

51.     Later that same day, Detectives Winins and Cade visited the address Mr. Johnson provided, where they found Mr. Ware.  Detective Winins told Mr. Ware he was a suspect in a murder and armed robbery, but that he knew that "Jerry [Davis] was the gunman, that Jerry [Davis] did the shooting."

52.     Mr. Ware and Mr. Davis had previously been arrested together, which may explain where Detective Winins came up with Mr. Davis's name.

53.     During that conversation with Detective Winins, Mr. Ware "admitted [to] taking the purse" and advised detectives that he would "help . . . in any way that he could."  Around 5:00 P.M. that day, Mr. Ware gave a typewritten statement.

54.     In that statement, Mr. Ware said he and Mr. Davis were walking down Chef Menteur Highway when they noticed Mr. Broussard outside his camper.  Mr. Davis "held the white male occupied," while Mr. "Ware went into the trailer [and] took the lady's purse, then . . . heard a shot, exited the trailer, and upon doing so observed the white male lying on the ground and Jerry

10

Davis running from the scene." Later, the two met up at McDonough Number Forty Elementary School and split the money from the purse, leaving the purse in the cafeteria.

55. Mr. Ware also described in detail the exact clothing he wore on the night of the incident: "some brown pants, a white T-shirt, and a brown sweater with some tennis shoes." When asked to describe the clothing Mr. Davis wore that night, however, Mr. Ware said he could not recall a single thing that Mr. Davis was wearing.

56. Around 6:00 P.M., after Mr. Ware gave his statement, Detective Winins formally arrested him for murder and armed robbery.

57. The same evening, at 7:21 P.M., Detective Winins met with Mr. Davis, who was being held on unrelated charges. Mr. Davis refused to make any statement. The interview was terminated, and he was "re-booked in the Central Lock-up with the murder of John Broussard and also the armed robbery."

58. Mr. Johnson returned to give a typewritten statement the day after Detective Winins spoke with and arrested Mr. Ware. Although Mr. Johnson told police the day before that he had learned of the crime from Mr. Ware, in this statement, his story changed. This time, he told Detective Winins that he had learned of the crime from Mr. Davis.

59. In his typewritten statement, Mr. Johnson said he was "cruising around Dale Street and ran into Jerry Davis so [he] picked him up and . . . asked him when was the last time he ran into John [Phillip] Ware." Mr. Davis purportedly told Mr. Johnson that he and Mr. Ware "had robbed a couple in the trailer park," and that he had "sent [Mr. Ware] into the trailer to get the pocketbook" while he "was out there holding [Mr. Broussard]." When Mr. Broussard "iffed" at him, Mr. Davis fired the shot. Mr. Johnson's new version of the story matched up exactly with Mr. Ware's typewritten statement.

60.     Mr. Johnson further claimed, supposedly without prompting, that Mr. Davis had told him exactly where the murder weapon came from.  According to Mr. Johnson, Mr. Davis "told [him] that the pistol they used was taken out of a ladies [sic] pocketbook which was in a pickup truck while she was getting gas," that the pickup truck was blue, and that the incident occurred "about one month before the murder" at "the Amoco station at Chef and Dale."  When asked if Mr. Davis told him what he did with the murder weapon, Mr. Johnson stated that "he sold it to somebody, he didn't mention any name," and that "he said he didn't want to get caught with it."

61.     When police later recovered the murder weapon, the serial number matched a gun that had been reported stolen on April 23, 1983.  A woman had reported her Beretta .25 caliber pistol stolen from her "make-up bag inside [her] purse" from the gas station on Chef Menteur Highway and Reynes Street.  Reynes Street runs parallel to Dale Street and intersects with Chef Menteur Highway one block west of Dale Street.  That narrative is perfectly consistent with Mr. Johnson's description of the murder weapon's history.

62.     On June 23, 1983, Detective Winins visited McDonough Number Forty Elementary School, where Mr. Ware claimed he and Mr. Davis had split the money stolen from Mrs. Broussard and left the purse behind.  Around 10:30 A.M., Detective Winins recovered a purse that matched Mrs. Broussard's description.

63.     When crime lab technician Gilbert Luke arrived on the scene, he took photographs of the purse and the location where it was found.  Detective Winins reported that Mr. Luke confiscated the purse and forwarded it to the Criminal Property and Evidence Room.  Though Detective Winins wrote in his report that he obtained a Crime Lab Report and attached it to the case file, no such report was recovered in the case file nor was any report turned over to the defense.

64.     The following day, Detective Winins visited Mrs. Broussard in Mississippi to conduct a second photo line-up.  Upon viewing a "six picture photographic line-up, which consisted of a picture of . . . [John] Phillip Ware," Mrs. Broussard positively identified Mr. Ware and advised Detective Winins that "there was no doubt in her mind that Mr. Ware was the man who had entered the camper the night her husband was killed and took her purse."

65.     On July 5, 1983, Detectives Donald Curole and Marco Demma notified Detective Winins that they were at 4634 Camelia Street with Herman Bernard, "who stated he was in possession of the gun that was possibly used in the murder of John Broussard," and that they were en route to the Homicide Office.

66.     At the office, Detective Winins purportedly took a statement from Mr. Bernard, in which Mr. Bernard said "he knew nothing of the murder, but did know that a friend of his, Leroy Jackson, had bought a gun" from Mr. Davis about three weeks prior.  Mr. Bernard said Mr. Jackson had asked him to hold the gun for no apparent reason.  As discussed in more detail in Section D, *infra*, Mr. Bernard has since provided a sworn statement that he was never taken to the homicide office and did not give or sign a typewritten statement.

67.     Jerry Davis was indicted for first-degree murder on July 7, 1983.

**C.     Jerry Davis's Trials and Conviction**

68.     Mr. Davis's case was assigned to Assistant District Attorney James Williams, a pro-execution zealot who proudly displayed on his desk a working model electric chair adorned with pictures of Black men he had sentenced to death.  He wanted these men to know it was "personal" in the "worst way" and fantasized about being the "last face" those men would "ever see."  In this case in particular, Mr. Williams told the jury that his "plan" was to secure "a verdict, which would lead to [Mr. Davis] being electrocuted."

69.     On July 19, 1983, Mr. Davis was arraigned and entered a plea of not guilty.

70.     On July 25, 1983, Mr. Davis's counsel filed an Application for Bill of Particulars, requesting any evidence "materially favorable to the defendant," statements of non-testifying witnesses, any deal made by NOPD or DA's office for the testimony of the co-conspirator, and arrest and conviction records.

71.     In its answer to the defense's requests, the State answered that there was no evidence materially favorable to the defense, that the defense was not entitled to statements of non-testifying witnesses, and that any deal with the co-conspirator and any arrest and conviction records were "not applicable."

72.     On or around January 30, 1984, Mr. Williams wrote a memorandum to First Assistant District Attorney Jack Peebles, requesting to reduce Mr. Ware's charge to manslaughter in exchange for his testimony. Mr. Williams explained that without Mr. Ware's testimony, the State would have to rely on Mr. Johnson's testimony, and Mr. Johnson was an unreliable witness due to his "long criminal record." Mr. Peebles responded, "OK."

73.     On the morning of January 30, 1984, Mr. Ware pleaded guilty to the charge of manslaughter.

74.     Mr. Davis went to trial that same day.

75.     In his opening statement, Mr. Williams stated that "no one else . . . saw [Jerry Davis] get away. . . . [Detective Winins] had no leads. They had nothing until two or three weeks later, when a fellow by the name of Allen Johnson . . . gave the police information. 'I know who did it . . . it was Jerry Davis, and he was with Philip [sic] Ware.'" That narrative contradicted Detective Winins's reported timeline of the investigation, as he interviewed at least two witnesses before Mr. Johnson—namely, Mr. Cornish and Mr. Celino—both of whom witnessed the perpetrators running from the scene of the crime. Further, when Mr. Johnson first came to the

police, he said only that he knew Mr. Ware was responsible for the incident.  Mr. Johnson did not mention Jerry Davis until *after* Mr. Ware had implicated Mr. Davis.

76.     Mr. Williams began with a direct examination of Detective Winins.  Detective Winins testified that when he was assigned to the case, he went to Methodist Hospital where he interviewed Mrs. Broussard.  That statement contradicts Detective Winins's daily reports, which state that Winins was unable to interview Mrs. Broussard at the hospital because she was not "mentally able" and that he first took a typewritten statement from Mrs. Broussard over one month after the initial incident, on June 10, 1983.

77.     Detective Winins next testified that "approximately two weeks" after the incident, he returned to the scene to canvass the immediate area.  Detective Winins confirmed that because of this canvassing and "speaking with Mrs. Broussard," he had a possible suspect, given to him by Allen Johnson.  Again, the police reports, which indicate that Detective Winins did not speak with Allen Johnson when he canvassed the immediate area on June 6, 1983, contradict this version of Detective Winins's testimony.  In fact, all written reports indicate that Detective Winins first spoke with Mr. Johnson on June 21, 1983.

78.     Detective Winins further testified that "with the information received in Mr. Ware's statement, [he] did go out to other locations to recover some physical evidence . . . to no avail."  That too is refuted by Detective Winins's police reports, which say he recovered Mrs. Broussard's stolen purse when he visited McDonough Number 40 Elementary School "using the information he received from [John] Phillip Ware."

79.     Mr. Williams then showed Detective Winins the Beretta .25 caliber pistol recovered from Mr. Bernard.  Detective Winins confirmed he had received this pistol from Mr. Bernard, after

which Mr. Williams asked how "Herman Bernard came into possession of this gun."  Detective Winins responded that Mr. Bernard had received the gun from Jerry Davis.[2]

80.     Mr. Davis's defense counsel objected to the hearsay, but the court overruled his objection.

81.     Mrs. Broussard then testified that as her husband was outside the camper hooking up the electricity, she heard his voice, and when she looked up, she saw one of the perpetrators, whom she later identified as Mr. Ware, "at the door of the camper."  She stated that she tried to hold the door closed, but "he came in," she "backed away," and he took her wallet and purse.  As the perpetrator was "going out" of the camper, she "heard a pop."  In her first statement to police, however, Mrs. Broussard stated that the perpetrator entered her camper "immediately after" she heard a shot.

82.     When Mr. Williams asked Mrs. Broussard if the perpetrator struck her, she replied "No."  When Mr. Williams asked her if the perpetrator "threaten[ed] [her], or sa[id] anything at all to [her]," she responded, "he never said a word."  When Mrs. Broussard first spoke to police officers on the scene, however, she told them that the perpetrator "demand[ed] her money and purse" when he entered the camper.  And according to Mrs. Broussard's later typewritten statement to police, she reported that the perpetrator pushed her.

83.     When Mr. Williams asked Mrs. Broussard if she ever saw Mr. Ware with a gun, and if he was "the man who shot [her] husband," Mrs. Broussard responded "no" to both.  Mr. Broussard, however, stated in his dying declaration to police that the "perpetrator entering the camper was in possession of the weapon."

---

2.  Again, as discussed in Section D, *infra*, Mr. Bernard has since come forward and sworn that he never gave or signed a typewritten statement to police. Rather, when police showed up at his home and confiscated the murder weapon, Mr. Bernard told them he had stolen the gun from his boss to settle a debt, and that his boss had bought the gun from Allen Johnson, not Jerry Davis.

84.     Next, Mr. Johnson testified that he had heard about the armed robbery-homicide from Jerry Davis, who told him that he and Mr. Ware "had pulled a robbery in a trailer park and that he had just shot somebody." Though this testimony lined up exactly with Detective Winins's version of events, it contradicted what Mr. Johnson initially told the police. Indeed, it was not until *after* Mr. Ware spoke to detectives and implicated Mr. Davis that Mr. Johnson first mentioned Jerry Davis's name.

85.     Mr. Williams then asked Mr. Johnson if he had "pleaded guilty to any other crime besides" a 1977 conviction for simple burglary which had just been disclosed to the jury. Mr. Johnson responded, "no, that was the only one."

86.     In fact, at the time of Mr. Davis's trial, Mr. Johnson had three prior convictions of which the State was aware, yet which it failed to disclose to the defense and to the jury. The first was a 1977 misdemeanor conviction for theft, and the second was a 1979 felony conviction for unauthorized use of a moveable. The third was a felony conviction for burglary in 1983, for which Mr. Johnson was still awaiting sentencing.

87.     Mr. Williams was aware of Mr. Johnson's prior convictions. Indeed, just prior to trial, Mr. Williams wrote a memorandum in which he mentioned Mr. Johnson's "long criminal record, including two burglary convictions and an obscenity conviction." Nonetheless, Mr. Williams did nothing to correct Mr. Johnson's false testimony.

88.     Mr. Williams finally asked Mr. Johnson whether, "as a result of [his] testifying in this case, an obscenity charge, which [was] currently pending against [him], [would] be dropped." Mr. Johnson responded, "yes."

89.     Although Mr. Johnson did have his obscenity charge dropped in exchange for his testimony, the State withheld from the jury and the defense a second major incentive that Mr. Johnson received.

90.     At some time in early July of 1983, the ADA on Johnson's burglary case, Mike Begoun, wrote a memorandum addressed to First Assistant DA Jack Peebles regarding Mr. Johnson's recent burglary conviction.  Mr. Begoun wrote that Mr. Johnson's information was vital to the break in the Broussard homicide case, and that Mr. Johnson "should be shown some leniency" and not be "multiple-billed" as a habitual offender.  Upon receipt of the memorandum, Mr. Peebles wrote that he had been told to "give [Mr. Johnson] what we ha[ve] to in order to secure his cooperation in the homicide case."

91.     On July 22, 1983, Mr. Johnson received a twelve-year suspended sentence and five years of probation (even though, because he had a prior felony conviction, Mr. Johnson was ineligible for a suspended sentence).

92.     Further, Mr. Johnson had a long criminal history, including three prior convictions, and multiple arrests for violent crime, including one for armed robbery where Mr. Johnson allegedly told the victim he had a gun, stuffed the victim's mouth with cotton, and taped his hands.

93.     None of this was disclosed to the defense or to the jury.

94.     Moreover, in 2022, Mr. Bernard came forward and swore that Mr. Johnson "would say anything to not go to jail and was scared of white folk police."  Mr. Bernard recalled that "one time [Johnson] went round the neighborhood shooting cats and dogs with a B.B. gun [and] [w]hen the police showed up, he blamed his cousin."  That was an example of the lengths to which Johnson would go to avoid trouble with the police.  Mr. Bernard also said that "there was something mentally wrong with Allen [Johnson]," a description which was corroborated by notes from a

competency examination conducted in 1986, when Mr. Johnson was prosecuted for slashing a woman's tires.  Those notes described him as "a chronic schizo[phrenic]" with "severe symptoms" who was "dangerous to others" and who should be hospitalized for the "rest of his life."

95.     Finally, John Phillip Ware testified that on May 6, 1983, he and Mr. Davis were walking down Chef Menteur Highway, when Mr. Davis pointed out Mr. Broussard.  According to Mr. Ware, Mr. Davis suggested they "go over" to the trailer, and when they did, Mr. Davis told Mr. Ware to "look around in the trailer" while he "occup[ied] Mr. Broussard."

96.     When Mr. Williams asked Mr. Ware "what happened when [he] went into the trailer," Mr. Ware responded that Mrs. Broussard "was looking scared" but that he "never said nothing to her."  When asked if he "threaten[ed] or str[uck] her," Mr. Ware responded that he "never said nothing to her," nor did he strike her.  When asked what he did when he entered the trailer, he responded, "I say to her . . . her pocketbook is laying on the bed."

97.     That testimony contradicted both Mr. and Mrs. Broussard's initial statements to police, in which both reported that the perpetrator who entered the camper, positively identified as Mr. Ware by Mrs. Broussard, "demanded" Mrs. Broussard's money and purse when he entered the camper.  Further, according to Mrs. Broussard's official typewritten statement to police, Mr. Ware pushed her when he entered the camper.

98.     Mr. Ware then testified that as soon as he picked up the pocketbook, he "started out" and "heard a shot."  Upon exiting the trailer, he said, he saw Mr. Davis "running from the scene."  Mr. Ware testified that when the two later met up, he asked Mr. Davis whether he had shot Mr. Broussard, and Mr. Davis "smiled and shook his head."

99.     Mr. Ware said the two later met at McDonough Number Forty Elementary School to split up the money in Mrs. Broussard's purse.  He explained that Mr. Davis jumped the fence,

then Mr. Ware "threw him the pocketbook," after which Mr. Ware jumped over the fence as well. According to Mr. Ware, it was Mr. Davis who "took the money out" of the pocketbook.

100.    At the close of his direct examination, Mr. Williams asked Mr. Ware if he had any other convictions aside from the manslaughter charge to which he had just pleaded guilty. Mr. Ware responded, "no sir."  In fact, at the time of Mr. Davis's trial, Mr. Ware had two prior convictions, one for escape in October of 1980 and one for battery in December of 1980.  The State, which possessed Mr. Ware's rap sheet, was aware that Mr. Ware's testimony was false.

101.    During cross-examination, defense counsel asked Mr. Ware about his decision to speak to the police and implicate Mr. Davis.  Mr. Ware said Detective Winins came to speak to him at his mother's house and told him that "he knew that [he] had participated in this crime, but he know [sic] that Jerry [Davis] was the gunman, that Jerry [Davis] did the shooting."  Thus, Mr. Ware confirmed that it was not until *after* Detective Winins spoke to Mr. Ware on June 21, 1983 and told him that he "[knew] Jerry [Davis] was the gunman" that any witness implicated Mr. Davis. Indeed, Mr. Ware provided a typewritten statement implicating Mr. Davis only *after* Detective Winins suggested the gunman was Mr. Davis, and Mr. Johnson's typewritten statement implicating Mr. Davis was given the following day, on June 22.

102.    On redirect examination, Mr. Williams asked what Mr. Ware did with Mrs. Broussard's stolen pocketbook.  Mr. Ware said he gave it to Mr. Davis, and thus "never had no more possession of the pocketbook."  When asked what Mr. Davis did with the pocketbook, Mr. Ware said it was "still in the cafeteria" of McDonough Number Forty Elementary School when he left the area.

103.    But during his investigation, of course, Detective Winins had recovered a purse matching Mrs. Broussard's description at McDonough Number Forty Elementary School in the

cafeteria area.  Detective Winins wrote in a police report that the purse was confiscated by Crime Lab Technician Gilbert Luke, who forwarded the purse to the Criminal Property and Evidence Room.  The purse was not introduced into evidence, nor was it turned over to the defense.  The jury was never told that NOPD had recovered the purse.

104.    Mr. Williams did nothing to correct Mr. Ware's false testimony, nor did any other prosecutor or OPDA employee.

105.    Neither Mr. Celino nor Mr. Cornish—the two eyewitnesses who initially spoke to police—testified at trial, nor were the reports indicating their statements provided to the defense or to the jury.  This omission is significant because both men described the perpetrators as being roughly one inch apart in height.

106.    Mr. Ware is six feet tall.  Mr. Johnson is six feet one inch tall, and so fits the description as a possible second perpetrator.  Mr. Davis, on the other hand, is just five feet six inches tall.

107.    In her closing statement, ADA Holly Taylor relied heavily on the testimony that the shot occurred while one of the perpetrators was in the camper.  Because Mrs. Broussard testified that she was inside the camper with Mr. Ware when the shot occurred, the State argued, Mr. Davis must have been the shooter.  The State failed to disclose, however, that the initial incident report and complaint history stated that the shot occurred *before* either of the perpetrators entered the trailer, and that it was the armed perpetrator who entered the camper.

108.    Ms. Taylor next focused on Mr. Johnson's importance to the break in the case, claiming that Mr. Johnson provided both Mr. Ware's and Mr. Davis's names "prior to the arrest of either of those people."  That statement was false.  As explained above, Mr. Johnson only provided Mr. Ware's name—not Mr. Davis's name—prior to their arrests.

109.    In both their closing statements, Williams and Taylor also emphasized the facts that Mr. Johnson's initial statement was not induced by any offer, and that it was his *testimony* that led to his obscenity charge being dropped.

110.    For instance, Ms. Taylor stated that, at the time Mr. Johnson provided this "initial information," he didn't "have an interest at [that] point. He ha[d] no interest at all," because he was not arrested on the obscenity charge until June 22, 1983, one day after he initially spoke to detective about Mr. Ware.

111.    Mr. Williams also emphasized that Mr. Johnson had no reason to come to the police on June 21st and "lie about what happened."  Of course, as explained *supra* at paragraphs 89-91, Mr. Johnson had incentive to gain leniency in sentencing for his recent burglary conviction.

112.    Mr. Williams also argued that Mr. Johnson was trustworthy because he "heard about [the incident] from defendant Jerry Davis" himself.  That contradicts Mr. Johnson initial report to police that he learned of the incident from Mr. Ware "while they were getting high."

113.    Both Williams and Taylor also emphasized the fact that Mr. Ware didn't hit Mrs. Broussard when he robbed her of her purse.  Mr. Williams stated that Mr. Ware "didn't touch her" and "didn't say anything to her."[3]

114.    Mr. Williams also claimed that Mr. Ware was offered the plea deal for manslaughter because they wouldn't have been able to convict him of first-degree murder, specifically because they would not have been able to prove specific intent to kill because Mr. Ware was in the camper at the time of the shooting.  This statement contradicts both Mr. and Mrs. Broussard's initial statements to police, as well as the complaint history, which all state that the

---

3.    As stated above, in Mrs. Broussard's typewritten statement to police, she said that Mr. Ware pushed her upon entering the trailer.  In addition, both Mr. and Mrs. Broussard said that Mr. Ware "demanded" Mrs. Broussard's money.

shot occurred before the perpetrator entered the camper.  Further, when Mr. Williams requested the reduction on the morning of Mr. Davis's trial, he explained that he was doing so because Mr. "Ware ha[d] indicated that he [would] testify against the triggerman Davis in return for the reduction," and that "it [was] highly unlikely that a verdict of guilty as charged would be found" as to Mr. Davis "if Ware was prosecuted for first degree murder."  Mr. Williams stated that without Mr. Ware's testimony, "[t]he best the state could hope for would be second degree murder, and that would be iffy."  That contradicts the statement he made to the jury about the rationale behind the charges against Mr. Ware.

115.    In response to defense counsel's argument about the lack of physical evidence presented to the jury, Mr. Williams stated, "[w]e don't have the purse . . . the purse was dumped somewhere. It's probably incinerated by now."  That contradicts Detective Winins's police reports, which stated that he did, in fact, recover the purse when he visited McDonough Number Forty Elementary School.  Nonetheless, the purse was never introduced into evidence or provided to the defense.

116.    The jury found Mr. Davis guilty of first-degree murder.[4]

117.    At sentencing, the jury was unable to come to a unanimous decision about capital punishment.  The Court accordingly imposed a life sentence without the possibility of parole.

118.    Mr. Davis was just twenty-four years old, and he would serve the next forty years of his life in prison for a murder he did not commit.

---

4.  Notably, Mr. Davis's jury was charged with instructions on reasonable doubt that the Supreme Court later held "allow[ed] a finding of guilt based on a degree of proof below that required by the Due Process Clause."  *Cage v. Louisiana*, 498 U.S. 39, 41 (1990).  Specifically, Mr. Davis's jury was told that doubt must be "substantial" and "give rise to grave uncertainty," phrases which the Supreme Court held were "contrary to the 'beyond a reasonable doubt' requirement," *Cage*, 498 U.S. at 41.

### D.   Jerry Davis's Post-Conviction Proceedings and New Evidence

119.   After the Fourth Circuit affirmed Mr. Davis's conviction and sentence, Mr. Davis filed an application for post-conviction relief based on improper jury instructions on reasonable doubt.  The Criminal District Court for the Parish of Orleans denied Mr. Davis's Application.

120.   Approximately three and a half years later, on December 4, 1991, Mr. Davis filed a second application for post-conviction relief, that time based on ineffective assistance of counsel.  On August 10, 1992, the Criminal District Court denied his application as untimely.  Three days later, Mr. Davis filed a Motion for Rehearing.  In September 1992, the Fourth Circuit affirmed the District Court's ruling that the application was untimely.

121.   In response, Mr. Davis filed a Motion for Rehearing and Denying the Writ, a Motion to Reconsider the Order and Remand the Proceedings Back Down to the Criminal District Court, and a Motion and Objection to the Court's Ruling and Judgment in Denying Post-Conviction Relief.  The Fourth Circuit denied these motions in November of 1992.

122.   On May 3, 1994, Mr. Davis received a copy of the NOPD file for the Broussard homicide, which included the Incident Report containing both Mr. and Mrs. Broussard's statements confirming that the perpetrator who entered the camper was the shooter; the daily reports written by Detective Winins containing witness descriptions of the perpetrators and Mr. Johnson's initial statement implicating Mr. Ware, not Mr. Davis; the typewritten statements of all testifying and non-testifying witnesses; and the memorandum written by Mr. Williams stating that he had knowledge of Mr. Johnson's "long criminal record," which was not disclosed at trial.  None of these documents had previously been provided to Mr. Davis or his attorney.

123.   Around October 7, 1994, Mr. Davis filed *pro se* another application for post-conviction relief.

124.    On October 25, 1994, the Criminal District Court denied Mr. Davis's application on the merits as to his claim that the State failed to disclose Mr. Bernard's typewritten statement, which stated that Mr. Bernard had received the gun from a man named Leroy Jackson.  The court found that the statement still implicated Mr. Davis, because Mr. Bernard's statement said that Mr. Jackson received the gun from Mr. Davis.

125.    On March 20, 1995, the Fourth Circuit denied Mr. Davis's application for supervisory writs.

126.    On June 13, 1995, the Criminal District Court issued an additional judgment denying relief based on the facts included in the initial incident report, finding that the "inconsistencies" between the reports were "obviously attributable to the haste with which the initial report was prepared."

127.    On March 27, 1997, Mr. Davis petitioned *pro se* for a Writ of Habeas Corpus.  The court denied Mr. Davis's application on October 6, 1997.  On April 6, 1998, the Court of Appeals denied Mr. Davis's Motion for a Certificate of Appealability.

128.    When IPNO began investigating Mr. Davis's case in 2021, it uncovered additional exculpatory evidence that had not been provided to the defense or presented to the jury, including the complaint history confirming Mr. and Mrs. Broussard's initial accounts of the incident and the incident report for the theft of the murder weapon, which exactly matched the account Mr. Johnson provided to the police when he implicated Mr. Davis.  IPNO also uncovered Mr. Johnson's arrest and conviction history at the time of the investigation and prosecution, which included Mr. Johnson's status as awaiting sentencing in his burglary case when he initially came to police, his history of arrests for violent crimes, and a memorandum from the OPDA granting Mr. Johnson

sentencing benefits in his burglary case.  It also uncovered Mr. Ware's arrest and conviction history, which confirmed that Mr. Ware lied about his convictions on the stand.

129.    In 2022, Mr. Bernard averred that he never gave a typewritten statement to police. He explained that when police showed up in 1983, he told them that he stole the gun from Leroy Jackson, his boss at the time, to settle a debt.  Further, he explained that he saw Mr. Jackson buy the gun from Allen Johnson, not Mr. Davis.  Mr. Bernard stated that "it felt like [the police officers] were trying to get me to say I got [the gun] from [Mr. Davis] because they kept asking me even after I said I stole it from Leroy."  Mr. Bernard stated that he didn't even know Jerry Davis's full name, but only knew him by his nickname "Jake."  This further undermines his alleged typewritten statement, which refers to Mr. Davis as "Jerry."

130.    Mr. Bernard never saw or signed any typewritten statement.

131.    On March 29, 2023, Mr. Davis filed an Application for Post-Conviction Relief in the Criminal District Court for the Parish of Orleans.

132.    After forty years of incarceration for a crime that he didn't commit, the Court vacated Mr. Davis's conviction and sentence, given the "breadth and severity of the *Brady* violations and *Napue* violations."  The Court held that Mr. Davis was entitled to a new trial.

133.    On March 15, 2024, the State filed a nolle prosequi motion, terminating the case in Mr. Davis's favor.

**E.    The City of New Orleans's, NOPD's, and OPDA's Deliberate Indifference to Official Misconduct, Including *Napue* and *Brady* Violations, Fabrication of Evidence, Malicious Prosecution, and Their Failures to Train, Supervise, and Discipline Their Employees**

134.    Mr. Davis's wrongful conviction and imprisonment were not a random miscarriage of justice in an otherwise well-functioning law enforcement regime.  Rather, during the relevant period, the NOPD; the OPDA; policymakers acting on behalf of those agencies; Defendant the

City of New Orleans; and/or Orleans Parish engaged in the following misconduct, which was reflected in, and led to, Mr. Davis's false conviction: officials acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity; and implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the constitutional duties of OPDA, NOPD, and other City and/or Parish officials—including, but not limited to, failing to properly documenting and disclosing exculpatory information,   fabricating evidence, and maliciously prosecuting innocent individuals without probable cause.

### 1.  *The City's, NOPD's, and OPDA's Policies, Customs, and Practices of Condoning and Encouraging Misconduct*

135.   Prior to, and at the time of, the unlawful investigation, prosecution, and incarceration of Mr. Davis, the NOPD and OPDA—both agencies of the City of New Orleans and/or Orleans Parish—by and through their policymakers, maintained a policy, custom, or pattern and practice of condoning official misconduct, including by failing to train, supervise, and discipline police officers and prosecutors.

136.   Among other things, the NOPD failed to maintain individual training records; failed to conduct any in-service or advanced training for supervisors; failed to ensure that its supervisors had the training and resources to supervise serious investigations, including of murders; and failed to adequately document and enforce disciplinary investigations and findings against individual officers.

137.   In 1991, less than a decade after the murder investigation in this case, the International Association of Chiefs of Police published a report citing a "stunning lack of training" at the NOPD and finding that the NOPD's training record was "not nearly in compliance with professional expectations."  The report concluded that the NOPD's failure to keep training records

"leaves the department dangerously defenseless against failure-to-train based allegations and lawsuits." With respect to criminal investigations, the report concluded, "[T]he CIB [the Criminal Investigation Bureau] is failing in almost every crime category. While the entire department must share responsibility for this poor performance, the CIB is simply not getting its portion of the job done. . . . [P]rimitive case management practices, absence of performance goals, measurement accountability, flawed selection process, and a stunning lack of training inhibits investigative effectiveness."

138. Throughout the 1970s, 1980s, and 1990s, the NOPD maintained a widespread practice of promoting, facilitating, and/or condoning improper, illegal, and unconstitutional investigative techniques, including, but not limited to: (a) creation and presentation of false or materially misleading evidence; and (b) failure to document and disclose exculpatory and impeachment evidence to prosecutors, defense counsel, and courts; as well as engaging in the affirmative and/or passive concealment of those types of misconduct.

139. Despite having actual or constructive notice that the NOPD's custom, pattern, and practice of promoting, facilitating, and/or condoning improper, illegal, and unconstitutional investigative techniques, and failing to adequately supervise, discipline, and train its officers, was reasonably likely to lead to constitutional violations similar to those perpetuated against Mr. Davis, the NOPD leadership continued to maintain those customs, patterns, and practices of deliberate indifference to the rights of the suspects.

140. With respect to training in particular, in 1994, the Louisiana National Guard, in partnership with the City, found that "[a] great deal has been written about the state of training within the NOPD. Year after year it does not seem to improve. It is clearly apparent that the city and department leaders do not understand, or simply choose to ignore, the importance of training

for police officers and police civilians engaged in supporting police officers. . . .   Unfortunately, even after three previous reports criticizing training within the NOPD, very little action has been taken to improve the situation."

141.   NOPD supervisors and policymakers had actual and constructive notice of the NOPD's policy, custom, pattern, or practice of investigative misconduct and failures to supervise and train through numerous cases and investigations that took place prior to the investigation in this case.   The misconduct committed in those cases by NOPD officers was actually or constructively known to NOPD supervisors and policymakers prior to Mr. Davis's wrongful conviction, and NOPD supervisors and policymakers failed to train, supervise, discipline, or otherwise reprimand NOPD employees in response to such actual and constructive notice.

142.   The NOPD's policy, custom, pattern, and practice of investigative misconduct and failures to supervise and train is illustrated through numerous cases and investigations preceding this case.   The misconduct committed in those cases by NOPD officers, including Defendant Winins, was actually or constructively known to NOPD supervisors and policymakers prior to Mr. Davis's wrongful conviction and, upon information and belief, NOPD supervisors and policymakers failed to train, supervise, discipline, or otherwise reprimand Defendant Winins and other NOPD employees in response to such actual and constructive notice.

143.   In addition, prior to and at the time of Mr. Davis's conviction, the NOPD, by and through its final policymakers, maintained a custom or practice of a "blue curtain," or code of silence, pursuant to which police misconduct—including, but not limited to, the manufacture of false evidence, the suppression of exculpatory evidence, and the malicious prosecution of innocent individuals without probable cause—was routinely not reported by fellow officers or disciplined

or otherwise addressed by the department.  To the contrary, officers customarily engaged in misconduct themselves to cover up any misconduct they witnessed by a fellow officer.

144.    Senior policymakers at NOPD at the time of Mr. Davis's arrest and conviction were aware of the existence of the code of silence, and of rampant police misconduct and the culture of unaccountability that resulted from this custom, and were deliberately indifferent to its consequences, including that it caused constitutional violations.

145.    By way of example, in 1979, then-Superintendent James C. Parsons testified at a jury trial that a code of silence existed at the NOPD.  *Thomas v. City of New Orleans*, 687 F.2d 80, 82 (5th Cir. 1982).  In that case, Officer Thomas was retaliated against and discharged because of this complaint against a fellow officer.  Superintendent Parsons testified that he had considered taking steps to protect officers who broke the code of silence, but he did not do so.

146.    As another example, in 1981, NOPD paramedic Christopher Hero was wrongfully dismissed in retaliation for reporting to the Internal Affairs Division unlawful conduct of a police officer.  The City of New Orleans Civil Service Commission reinstated Mr. Hero and found that he had "established beyond doubt that a 'code of silence' does operate within the New Orleans Police Department …".  *See Christopher Hero v. Dep't of Police*, No. 1775 (Civil Service Commission, City of New Orleans, Mar. 17, 1983).

147.    Even prior to the *Thomas* and *Hero* cases, the NOPD had been put on notice that its disciplinary procedures were inadequate and fostered a culture of police protectionism.  A 1975 report on citizen complaints at the NOPD by McManis Associates, Inc., for instance, warned that the NOPD "suffers from the absence of clearly defined and enforced ground rules of behavior," and observed that "police personnel feel free to behave as they wish in most instances."

148.     Notwithstanding these and other warnings, the NOPD failed to institute meaningful reforms that would have constrained police misconduct and addressed the code of silence at the NOPD.

149.     Similarly, throughout the 1970s, 1980s, and 1990s, the OPDA maintained policies, customs, and practices that promoted, facilitated, and condoned misconduct by prosecutors and other OPDA employees and agents, including concerning the suppression of exculpatory and favorable evidence to criminal defendants and their counsel and the knowing use of false evidence to secure convictions.

150.     Prior to, during, and after Mr. Davis's wrongful prosecution and conviction, OPDA supervisors and policymakers had actual and constructive notice of a pattern and practice of prosecutors' *Napue* and *Brady* violations.   Repeatedly, when confronted with instances of misconduct, including in particular *Napue* and *Brady* violations, OPDA's supervisors and policymakers, as a matter of policy and custom, failed to impose reasonable discipline on the employee(s) involved and failed to take other reasonable, remedial measures to deter and prevent such misconduct.   OPDA supervisors and policymakers likewise failed to train and supervise OPDA employees regarding repeated *Napue* and *Brady* violations, despite their actual and constructive notice of a pattern and practice of such behavior, and despite the knowledge that their failure to train and supervise OPDA employees would likely result in wrongful prosecutions, convictions, and imprisonment of criminal defendants, including Mr. Davis.

151.     The OPDA's policy, custom, pattern, and practice of investigative misconduct and failure to supervise, train, and discipline is illustrated through numerous cases and investigations that took place prior to the investigation and prosecution in this case.   The misconduct committed in those cases by OPDA employees, including prosecutors involved in the case against Mr. Davis,

was actually or constructively known to OPDA supervisors and policymakers prior to Mr. Davis's wrongful conviction and, upon information and belief, OPDA supervisors and policymakers failed to train, supervise, discipline, or otherwise reprimand OPDA employees in response to such actual and constructive notice.

152.    The existence and ongoing nature of OPDA's policy, custom, pattern, and practice of investigative misconduct and failure to supervise, train, and discipline is illustrated through numerous cases and investigations that took place during or after the investigation and prosecution in this case.

> **2. *The City's, NOPD's, and OPDA's Policies, Customs, and Practices of Suppressing* Brady *Information***

153.    At all relevant times, the City of New Orleans, NOPD, and OPDA, as a matter of policy, custom, and practice, permitted, encouraged, and acquiesced to the suppression of *Brady* information.

154.    At all relevant times, the City's, NOPD's, and OPDA's policies, rules, and procedures governing documentation and disclosure of information collected during criminal investigations was not designed to, and did not, adequately ensure that the NOPD, the OPDA, and their employees documented or disclosed *Brady* information to suspects or defendants, courts, and, in some cases, prosecutors.

155.    The OPDA's unconstitutional policies, practices, and customs included: (1) OPDA did not create a written, *Brady*-specific policy to instruct its prosecutors about their *Brady* obligations; (2) OPDA provided insufficient training on *Brady* compliance and *Brady* issues for its prosecutors; (3) OPDA provided insufficient monitoring and supervision of its prosecutors to ensure compliance with *Brady*; (4) OPDA had insufficient disciplinary procedures for addressing *Brady* violations and did not discipline prosecutors who did not comply with their *Brady*

obligations; (5) OPDA required prosecutors to withhold documents that were not required to be disclosed by law, without adopting sufficient safeguards to ensure that *Brady* was nonetheless complied with; (6) OPDA did not require its prosecutors to obtain favorable information from police officers; (7) OPDA did not institute or maintain procedures for the proper handling, tracking, and disclosure of *Brady* information in related cases and cases handled by multiple prosecutors; (8) OPDA defined the scope of prosecutors' disclosure obligations as including only evidence that was affirmatively exculpatory, as opposed to evidence that was impeaching or otherwise favorable to the defense; (9) OPDA maintained, cultivated, and tolerated a widespread culture of suppressing favorable information from defendants; and (10) despite court decisions finding repeated *Brady* violations by OPDA, OPDA leadership—including Mr. Connick and his successors—failed to acknowledge that OPDA had a problem with *Brady* compliance and did not act to remedy the office's relevant policies, practices, and customs in order to ensure compliance with *Brady*.

156.    The City of New Orleans and both the NOPD and the OPDA (sued through their then-current final policymakers) have revealed, through discovery in other wrongful conviction lawsuits and otherwise, that their policymakers created and furthered policies and practices that encouraged and tolerated *Brady* violations.  For example, former Orleans Parish District Attorney Leon Cannizzaro, Jr., described the tenure of his predecessor, Mr. Connick, as follows: "In the decades preceding my administration, the District Attorney's office [*i.e.*, under Mr. Connick, from 1974 to 2003] had been in a steady state of decline.  Over the course of that time period, bad policy decisions took root and became institutional."  Mr. Cannizzaro observed that, as a result of the *Brady* claims in the case *Thompson v. Connick*, "some of those policy decisions had collateral consequences in the form of civil liability against the office."

157.    Indeed, during his tenure as District Attorney, Mr. Connick repeatedly and publicly expressed disdain for the *Brady* doctrine and rebuffed suggestions—including, in one notable instance, a plea from a sitting Orleans Parish Criminal District Court Judge—that prosecutors be instructed on their *Brady* obligations and that the OPDA take steps to ensure compliance with the law and Constitution.

158.    The deficiencies of the OPDA's policies, customs, and practices regarding disclosure of *Brady* information are both legion and well-documented.  For example, Mr. Davis attaches as Exhibit 1 and incorporates by reference the expert report of Professor Laurie Levenson, filed in the case of *Jones v. Cannizzaro* et al., E.D. La. Civil Action No. 18-503, which methodically documents and discusses many of the deficiencies.

159.    The City's, NOPD's, and OPDA's policy and practice was to tolerate, fail to train, fail to discipline, and encourage violations of officials' constitutional obligations to make timely disclosure to the defense of *Brady* information.  The City's, NOPD's, and OPDA's deliberate indifference to such violations created a laissez-faire atmosphere that caused such violations to persist, including in Mr. Davis's case.

160.    As a result, these policies, customs, and practices directly and proximately caused the violations of Mr. Davis's constitutional rights described herein and his wrongful conviction, imprisonment, and other damages.

### (1)    Policies

161.    The City of New Orleans and both the NOPD and the OPDA (sued through their then-current final policymakers) have revealed, through discovery in other wrongful conviction lawsuits and otherwise, that the OPDA's formal policies permitted prosecutors to suppress *Brady* information by embracing an improperly circumscribed definition of "exculpatory" information

that was at odds with governing jurisprudence and the United States Constitution.  Moreover, at the time of Mr. Davis's prosecution and conviction, the OPDA's formal policies did not require prosecutors to disclose *Brady* information to criminal defendants, their attorneys, or the courts, at all.

162.    By declining to promulgate, much less enforce, any policy requiring timely disclosure of *Brady* information at the time of Mr. Davis's prosecution and conviction, the OPDA, through Mr. Connick, effectively delegated policymaking authority on such matters to individual prosecutors, including the prosecutors involved in Mr. Davis's prosecution and conviction.

163.    Even when the OPDA did adopt a formal policy requiring disclosure of some—but not all—*Brady* information to the defense in 1987, the policy was extremely deficient.  Among other things, the policy failed to instruct prosecutors: (a) on how to determine whether evidence is favorable, (b) to what extent (if any) impeachment information should be considered *Brady*, (c) to what extent the facts of an investigation focused on another suspect constitutes *Brady*, (d) how to address recanted testimony, (e) whether and to what extent prosecutors should be considering the materiality of exculpatory information when making disclosure decisions, (f) the timing of *Brady* disclosures, (g) prosecutors' responsibility to determine whether other prosecutors or law enforcement personnel have *Brady* information, (h) how to obtain advice regarding *Brady* disclosures, (i) specific examples from prior cases demonstrating OPDA's failures to meet its *Brady* obligations and summaries of relevant case law, and (j) to what extent (if any) prosecutors should disclose undocumented *Brady* information.

164.    On the materiality question, for example, former District Attorney Harry Connick has testified that while "[m]ateriality was very important" under his office's *Brady* policy, there was no instruction on how to define materiality or guidance for prosecutors to make such

determinations. Instead, Mr. Connick testified, prosecutors "were supposed to figure it out themselves."

165. At the time of Mr. Davis's wrongful investigation, prosecution, and conviction, Mr. Connick was the official policymaker with final policymaking authority for the OPDA.

166. In addition, Mr. Connick set a specific policy against "open file discovery" (in other words, prosecutors were forbidden to turn over all evidence in their file to the defense). He repeatedly resisted attempts to open discovery for the defense and, instead, promulgated policy manuals instructing his prosecutors to withhold all documents that were not required by law to be disclosed. He also specifically instructed his lawyers not to give up any information that, in their opinion, did not fall within the *Brady* rule and placed the burden on the defense to scour files to determine what evidence might be missing.

167. These conservative discovery policies increase the chance that prosecutors will—mistakenly or otherwise—err on the side of not disclosing material to the defense. When paired with a complete lack of training, supervision, or discipline regarding *Brady* obligations, these policies inevitably led to repeated *Brady* violations throughout the course of Mr. Connick's tenure as District Attorney. Despite this fact, Mr. Connick did not adopt any safeguards to ensure that *Brady* material was disclosed as required.

168. In addition, OPDA did not have a policy that required prosecutors to report either their own or other prosecutors' *Brady* violations. Even when OPDA did become aware of *Brady* violations, it did not have a policy about responding, tracking, or assessing patterns that emerged from those violations. In essence, then, OPDA's policy was to simply ignore *Brady* violations when they inevitably occurred.

169.     Finally, the OPDA has claimed that their policy generally was that prosecutors had to follow ethical rules that were not otherwise specifically set forth in policy manuals, and that this was a sufficient policy to ensure *Brady* compliance.  It was not.  Among other reasons, the ethical rules in place at the time of Mr. Davis's prosecution did not require full disclosure of *Brady* information.

170.     Without a written *Brady* policy, it is entirely predictable that prosecutors would repeatedly violate *Brady*—as they did before, during, and after Mr. Davis's wrongful investigation, prosecution, and conviction.

### (2)     Practices

171.     OPDA provided little or no training regarding prosecutors' *Brady* requirements. Several former OPDA prosecutors have testified that they did not recall receiving any training on *Brady* at OPDA, and, in a prior litigation, the OPDA was unable to produce *any* evidence of *Brady* training that occurred prior to 2002.  This practice of failing to provide training to prosecutors regarding their *Brady* obligations created an environment in which *Brady* violations were inevitable and, indeed, openly tolerated.

172.     In addition, prosecutors at OPDA—including inexperienced prosecutors handling serious cases—lacked adequate supervision of their *Brady* practices.  Testimony from former OPDA prosecutors confirm that supervisors generally relied on the line prosecutor to proactively raise potential *Brady* issues, and that there "weren't specific checks and balances established to ensure that *Brady* was fulfilled."  OPDA's failure to adequately supervise prosecutors' *Brady* practices generally, and the lack of supervision of *Brady* decisions in individual cases, increased the chances that there would be repeated and serious *Brady* violations.

173.     Finally, OPDA lacked a consistent system to discipline prosecutors who committed *Brady* violations.  In deposition testimony taken in *Jones v. Cannizzaro* et al., E.D. La. Civil Action No. 18-503, Mr. Connick could not detail how OPDA's disciplinary system worked, and several former prosecutors testified that they could not recall any discipline ever being imposed as a result of a *Brady* violation.  At most, Mr. Connick and some former OPDA prosecutors could only consistently recall two possible instances in the history of OPDA during which an active OPDA prosecutor was disciplined for a Brady violation, despite a record of dozens of violations committed by the office.  In both cases, the "discipline" amounted to a conversation with Mr. Connick that included a warning to comply with *Brady* in the future.

174.     Similarly, the NOPD provided little or no training regarding police officers' *Brady* requirements.  In a 2017 deposition, for example, former NOPD detective John P. Dillmann, III testified that he was not aware of any official policies regarding whether specific types of evidence—such as inconsistent witness statements—needed to be given to the prosecutor's office or produced to the defense, and, indeed, did not recall any specific training regarding *Brady* obligations.  Mr. Dillmann was a detective in the NOPD throughout the 1970s and 1980s, including at the time of Mr. Davis's wrongful arrest, prosecution, and conviction.

175.     This complete failure to train, supervise, and discipline employees regarding their *Brady* obligations predictably led to repeated *Brady* violations that continued unabated for decades.

### (3)     Customs

176.     In addition to its unlawful policies and practices, the OPDA, through its final policymakers, created and at all relevant times maintained a "pervasive culture of indifference to

*Brady*," which directly caused Mr. Davis's wrongful conviction. *Cf. Connick v. Thompson*, 563 U.S. 51, 73 (2011) (Scalia, J., concurring).

177. At the time of Mr. Davis's prosecution and conviction, the OPDA's culture of indifference to *Brady* was well known throughout the office; was known to OPDA's policymakers (including Connick); has been evidenced by interviews, testimony, and other statements by former OPDA prosecutors, defense attorneys, and judges; and will be further evidenced through document discovery and depositions in this case.

178. A similar culture of indifference to *Brady* was adopted at the NOPD throughout the same time period. Indeed, Detective Dillmann (who was a detective in the homicide unit of the NOPD throughout the 1970s and 1980s) testified that, during the relevant time, secretaries in the office were responsible for reviewing the case file and determining what would be provided to the prosecutors. He testified that his understanding was that "anything that was of evidentiary value that was going to be used at trial would be sent to the DA's office," and that "[i]f it was not of evidentiary value and not going to be used at trial, [he] d[id]n't think it would be sent over." Finally, he testified that, as lead detective, he would have no way of knowing what had or had not been turned over to the prosecution. In other words, the NOPD had a custom of leaving the provision of *Brady* material to administrative staff, with no oversight, no training, and no system in place to ensure exculpatory material was ever provided to the prosecution or produced to the defense.

179. As the National Registry of Exonerations has reported, in the 1980s, concealing exculpatory evidence in New Orleans was routine. Justice John Paul Stevens observed in 1995 that the OPDA's *Brady* violations were "blatant and repeated." Justice Ruth Bader Ginsberg later observed in 2012 that the OPDA during the 1980s was "a tinderbox . . . in which *Brady* violations

were nigh inevitable." For example, John Thompson was sentenced to death in 1985 because a New Orleans prosecutor hid (and eventually lost or destroyed) a critical item of physical evidence: a piece of cloth with a stain of the criminal's blood that tests had proven could not have come from Mr. Thompson.

180.     Empirical data support this conclusion. Orleans Parish has the highest per capita exoneration rate of any county or parish in the country. As of 2020, in 78% of exonerations from New Orleans, exculpatory evidence was concealed (*i.e.*, in 18 of the 23 exonerations); prosecutors committed misconduct in nearly 90% of those cases (*i.e.*, in 16 of the 18 cases in which exculpatory evidence was concealed).

181.     In addition to post-conviction exonerations, there are at least 51 criminal cases from New Orleans in which courts have found and/or the prosecution has acknowledged that the NOPD and/or OPDA violated *Brady*, as well as several others in which strong claims of *Brady* violations existed but the convictions were reversed on other grounds. As such, the actual total of cases with concealed exculpatory evidence is much higher.

182.     The following cases provide three illustrative and notable instances of the City's and/or Parish's policies, customs, and practices of tolerating, failing to discipline, and encouraging violations of officials' constitutional obligations to make timely *Brady* disclosures:

   a. *Connick v. Thompson*, 563 U.S. 51 (2011): John Thompson was wrongfully convicted of murder. Roughly one week before Thompson's trial, a blood sample collected from the crime scene was sent to the crime laboratory; two days before trial, an Assistant District Attorney ("ADA") received the report, stating that the perpetrator had blood type B. He later claimed to have put the report on another ADA's desk. On the first day of trial, a third ADA checked out all the physical

evidence in the case from the police property room, including the bloodstained swatch.  This third ADA then checked all the evidence, except the swatch, into the courthouse property room.  Neither the lab report nor any mention of the swatch was ever disclosed to Thompson's counsel.  When a private investigator discovered the crime lab report in New Orleans Police Crime Laboratory files, Thompson's blood was tested.  He was determined to be type O, and therefore not a match for the undisclosed blood samples.

b. *Kyles v. Whitley*, 514 U.S. 419 (1995):  The U.S. Supreme Court granted habeas relief to Curtis Lee Kyles for his 1984 conviction and held that the prosecution had withheld evidence favorable to the defense—significantly, that a key, non-testifying witness had made inconsistent and self-incriminating statements to the police.  The defense was also never told that an eyewitness, who testified that Mr. Kyles was the perpetrator, had described the perpetrator as having features significantly different from Mr. Kyles's.  Moreover, the prosecution also suppressed a list of cars present at the crime scene after the murder—a list that would have exculpated Mr. Kyles.

c. *Floyd v. Vannoy*, No. 11-2819, 2017 WL 1837676, 2017 U.S. Dist. LEXIS 69705, (E.D. La. May 8, 2017), *aff'd* 894 F.3d 143 (5th Cir. 2018):  This Court granted federal habeas corpus relief to John Floyd after suppression of forensic and other evidence led to his 1982 murder conviction.  The suppressed evidence included fingerprint results that the NOPD had analyzed and an affidavit that misrepresented information a witness gave to police.

183.    These three cases are not isolated incidents.    Other individuals who were documented victims of the *Brady* and *Napue* violations rampant in New Orleans in the 1970, 1980s, and 1990s include, but are not limited to, the following:

a. *Larry Hudson*:  In 1967, Larry Hudson was convicted of first-degree murder. Subsequently, a court found that the OPDA had failed to produce evidence that the state's only testifying eyewitness previously identified someone else in a photo array and was unable to identify that same person in a physical lineup.

b. *Hayes Williams*:  In 1968, Hayes Williams was convicted of first-degree murder. Subsequently, a court found that OPDA had suppressed a supplemental police report containing the prior inconsistent statement of the sole eyewitness to the crime.

c. *Linroy Davis*:  In 1968, Linroy Davis was convicted of manslaughter.  In 1973—a decade before Mr. Davis's wrongful conviction—the Fifth Circuit found that OPDA suppressed inconsistent statements by testifying and non-testifying witnesses that support the defendant's version of events, contradicted the state's version of events, and could have been used for impeachment.  *See Davis v. Heyd*, 479 F.2d 446, 453 (5th Cir. 1973).

d. *Roland Gibson*:  In 1968, Roland Gibson was convicted of first-degree murder. Subsequently, a court found that OPDA suppressed a supplemental police report containing the prior inconsistent statements of a key witness regarding his initially exculpatory account of the crime and alibis, which he gave before confessing to the crime and implicating Mr. Gibson.

e. *James Carney*:  In 1974, James Carney was convicted of second-degree murder.  In 1976, the Supreme Court of Louisiana vacated his conviction because, *inter alia*, OPDA violated *Brady* by suppressing a cooperation agreement with a key witness that could have been used to impeach his testimony.  *See State v. Carney*, 334 So. 2d 415, 419 (La. 1976).

f. *Michael Williams*:  In 1974, Michael Williams was convicted of second-degree murder.  Subsequently, a court found that OPDA had suppressed a police report containing a statement from a key witness that she had visited a methadone clinic approximately two hours before the crime, which contradicted her trial testimony and could have been used to impeach her identification of Mr. Williams.

g. *Arthur Monroe*: In 1974, Mr. Monroe was convicted of armed robbery.  In 1980, the Fifth Circuit found that the OPDA had suppressed a statement given to police by the victim, a key trial witness, that the defense could have used to impeach the witness on the grounds that he "improved" his trial testimony by adding facts to support the prosecution's theory.  *See Monroe v. Blackburn*, 607 F.2d 148, 152 (5th Cir. 1980).

h. *Norman Clark*:  In 1974, Norman Clark was convicted of heroin distribution.  Clark's defense secured subpoenas compelling testimony of material eyewitnesses to the charged drug transactions.  However, these eyewitnesses—police informants—"were made unavailable" because they "had been sent to Florida with spending money and at government expense through the combined efforts of state and federal officials."  An NOPD officer testified at Mr. Clark's trial "that it had been his suggestion to send [the eyewitnesses] out of Louisiana."  Indeed, it was

the NOPD officer who provided the eyewitnesses with spending money for their trip. After Mr. Clark was convicted, one of those eyewitnesses came forth with exculpatory testimony. In subsequent federal habeas proceedings, the United States Court of Appeals for the Fifth Circuit concluded the NOPD had "flagrantly violated" Mr. Clark's constitutional right to due process and his "conviction [could not] be allowed to stand." *Clark v. Blackburn*, 632 F.2d 531, 535 (5th Cir. 1980).

i. *Raymond Lockett*: In 1974, Raymond Lockett was also convicted of heroin distribution. "The State's evidence at trial tended to show that Lockett sold heroin to an undercover agent in the presence of two confidential informants," but when Mr. Lockett's lawyer "attempted to locate and subpoena" those informants, "[h]e was unable to do so," because the government had "willfully concealed [them] from the trial court." In other words, "the State had deliberately made key witnesses unavailable for [Mr. Lockett's] trial." The two informants who would have testified at Mr. Lockett's trial were the same two informants who would have testified at Mr. Clark's, and the same NOPD officer orchestrated their unavailability. The Fifth Circuit later concluded that the NOPD's "deliberate concealment of a named eyewitness whose testimony would admittedly be material constitute[d] a prima facie deprivation of due process." *Lockett v. Blackburn*, 571 F.2d 309 (5th Cir. 1978).

j. *Floyd Falkins*: In 1976, Floyd Falkins was convicted of armed robbery. In 1978, the Supreme Court of Louisiana vacated his conviction because it found that the OPDA had suppressed evidence casting doubt upon testifying witnesses' identifications of the defendant as the perpetrator, specifically the fact that two

witnesses had previously identified a man who was concededly not involved in the crime as a perpetrator.  *See State v. Falkins*, 356 So. 2d 415 (La. 1978).

k.  *Errol Bernard*:  In 1976, Errol Bernard was convicted of second-degree murder.  Subsequently, the Orleans Parish Criminal Court set aside the conviction and vacated the sentence imposed upon Mr. Bernard because of *Brady* material that was withheld and ordered that he be afforded a new trial.

l.  *Gregory Bright*:  In 1976, Gregory Bright was convicted of second-degree murder.  Subsequently, a court found that OPDA suppressed a supplemental police report containing witness statements that implicated persons other than the defendants in the crime and indicated that police pursued other suspects, as well as information that could have been used to impeach the credibility of the state's sole eyewitness.

m.  *Earl Truvia*:  In 1976, Mr. Truvia was convicted of second-degree murder.  Subsequently, a court found that OPDA suppressed a supplemental police report containing witness statements that implicated persons other than the defendants in the crime and indicated that police pursued other suspects, as well as information that could have been used to impeach the credibility of the state's sole eyewitness.

n.  *Norris Henderson*:  In 1977, Norris Henderson was convicted of second-degree murder.  Subsequently, a court found that OPDA suppressed an initial police report containing a victim's statement that cast doubt upon the victim's identification of the defendant.

o.  *Calvin Williams*:  In 1977, Calvin Williams was convicted of first-degree murder.  Subsequently, a court found that OPDA suppressed a police report casting doubt upon a witness's identification of the defendant, specifically that the witness had

not identified the defendant in a previous photographic lineup, and that contained prior inconsistent statements by the witness.

p. *Larry Curtis*:  In 1979, Larry Curtis was convicted of second-degree murder.  In 1980, the Supreme Court of Louisiana vacated his conviction because the state had suppressed information casting doubt upon a key testifying witness's identification of the defendant, specifically the fact that the witness had not identified the defendant as the perpetrator in a previous photographic lineup.  *See State v. Curtis*, 384 So. 2d 396, 398 (La. 1980).

q. *Issac Knapper*: In 1979, Issac Knapper was convicted of the armed robbery and first-degree murder of Dr. Ronald Banks. On appeal it was discovered that the lead investigator had failed to turn over a report containing exculpatory evidence before Knapper was convicted.  The undisclosed report contradicted evidence put on by the State at trial, including differing witness descriptions of the perpetrator, and confirmation that the gun used to kill Banks was the same gun used in a similar armed robbery in the area just a month earlier for which the gunman was identified. The court found that the police report was not only withheld from defense counsel but that it contained extremely favorable and exonerating evidence in violation of *Brady*, leading the court to overturn Knapper's conviction.

r. *William Perkins*:  In 1980, William Perkins was convicted of first-degree murder. In 1982, the Supreme Court of Louisiana vacated his conviction, finding that the state had suppressed a written witness statement given to police that supported the defendant's version of events and contradicted the state's version of events.  *See State v. Perkins*, 423 So. 2d 1103, 1108, 1110 (La. 1982).

s. *Ronald Monroe*:  In 1980, Ronald Monroe was found guilty of first-degree murder. In 1984, a federal court found that the state had violated *Brady* by suppressing information given to the police that implicated a different individual in the crime, specifically notes indicating that the victim's husband had confessed to her murder in a different jurisdiction.  *See Monroe v. Maggio*, No. 83-6277, slip op. at 8 (E.D. La. February 28, 1984).

t. *Reginald Adams*:  Mr. Adams was convicted of murder in 1983.  The only evidence used in Mr. Adams's trial was a coerced confession that got nearly every fact about the crime wrong.   The prosecution suppressed a police report showing that detectives had discovered the murder weapon, traced it to the people who had access to the gun shortly before the murder, and subsequently arrested one of them—on whom they found a bracelet stolen from the victim's home—for accessory to first-degree murder.  Nevertheless, detectives testified that their only real lead developed once Mr. Adams confessed and that they never located the murder weapon or any of the victim's stolen property.  The prosecution also falsely represented to Mr. Adams's defense team that no evidence was ever recovered and that no forensic examination, including ballistics testing, had ever been conducted, when the opposite was true.  Mr. Adams was exonerated in 2014.

u. *Stephen Rosiere*:  In 1984, Mr. Rosiere was convicted of second-degree murder. Subsequently, a court found that the state had suppressed statements by testifying and non-testifying witnesses to the police that supported the defendant's version of events (self-defense), contradicted the state's version of events, and could have been used to impeach witnesses.

v. *Calvin Duncan*:  In 1985, Mr. Duncan was convicted of first-degree murder after the prosecution withheld evidence that showed he had no knowledge of the crime, the perpetrator did not match Mr. Duncan's physical characteristics, and the identification process was completely unreliable.  In response to an explicit request from the defense for any exculpatory evidence in the case, the prosecution told the defense, "The state has no exculpatory evidence."  The prosecution also suppressed evidence that an officer on the case had a felony conviction.  Mr. Duncan was exonerated in 2021.

w. *George Toca, Jr.*:  In 1985, Mr. Toca was convicted of second-degree murder after the prosecution withheld exculpatory evidence, including witnesses' initial descriptions of the perpetrator that did not match Mr. Toca.  One witness also stated that he probably would not be able to make an identification but subsequently identified Mr. Toca at trial.  Moreover, the defense was not given a police report that supported Mr. Toca's alibi.  Specifically, the report detailed his alibi witness's call to the police after Mr. Toca's arrest, during which she reported that Mr. Toca was innocent and provided a tip pointing to someone else.  Mr. Toca was exonerated in 2022.

x. *Jerome Morgan*:  In 1994, Mr. Morgan was wrongfully convicted of second-degree murder after the prosecution withheld a 911 call log revealing that the police had arrived at the scene and sealed it up within a few minutes after the shooting, which undermined the prosecution's theory that Mr. Morgan fled the scene after the shooting and then returned before police arrived.  Two witnesses also later recanted their testimonies and said that police pressured them into falsely identifying Mr.

Morgan; in fact, during a photographic lineup, one detective pointed to Mr. Morgan's photo. Both witnesses also later testified that police told them Mr. Morgan was the shooter. Mr. Morgan was exonerated in 2016.

y. *Kuantau Reeder*: In 1995, Mr. Reeder was wrongfully convicted of second-degree murder after the prosecution failed to disclose that a key witness had a federal conviction for lying on a gun application (which the witness then lied about during testimony, a lie the prosecution did not correct). Although police recovered the jacket the shooter had been wearing and lifted a fingerprint from a stamp in the pocket, the print was not compared to Mr. Reeder's prints; in 2021, the NOPD examined the print and concluded that it excluded Mr. Reeder. Additionally, as the practice of the OPDA was to not turn over prosecutors' notes to the defense, the prosecution did not disclose that the key witness said twice that he had identified another suspect as the shooter during a photographic lineup. Mr. Reeder was exonerated in 2021.

z. *Larry Moses*: In 1995, Mr. Moses was convicted after prosecutors withheld the fact that one of their key witnesses had pinned crimes on romantic rivals in the past. The witness would later go on to share inconsistent accounts of the crime and admit to others that he set up Mr. Moses in an act of revenge. Additionally, the prosecutor relied on the testimony from a woman who was only 70 or 75% sure of the robber's voice that she heard on the night of the murders. Mr. Moses was exonerated in 2023.

aa. *Shareef Cousin*: In 1996, Mr. Cousin was wrongfully convicted of murder and sentenced to death after police coerced Mr. Cousin's former friend into implicating

him.  Mr. Cousin's conviction was reversed after it was determined that the prosecution had improperly questioned witnesses and improperly withheld a statement by the key witness that she was unable to see the perpetrator clearly and likely could not identify him.  Mr. Cousin was exonerated in 1999.

bb.  *Bernell Juluke, Jr.; Kunta Gable; and Leroy Nelson*:  Messrs. Juluke, Gable, and Nelson were each convicted of murder after the prosecution withheld exculpatory evidence, including police communication logs and information that undermined a witness's testimony.  The prosecution also withheld that a witness initially testified that the getaway car was green, contradicting his trial testimony that the car was blue.  Meanwhile, Mr. Juluke, who was pegged as the driver, had a gray car.  Moreover, two NOPD officers on the case who broadcast the information that implicated the three men were indicted in 1994 for drug dealing and conspiracy in a woman's death.  All three men were exonerated in 2022.

cc.  *Dan L. Bright*:  In 1996, Mr. Bright was wrongfully convicted of murder after the prosecution withheld FBI documents stating that a confidential informant had identified another man as the killer, as well as evidence that undermined the credibility of the prosecution's key witness.  Mr. Bright was exonerated in 2004.

dd.  *Robert Jones*:  In 2017, Mr. Jones was exonerated of four separate crimes, including rape, robbery, kidnapping, and manslaughter, after it was revealed in the years following his 1996 conviction that the prosecution and police had withheld numerous key facts.  Among other things, they failed to disclose: (1) the rape victim's descriptions of the perpetrator, which matched Lester Jones (the actual perpetrator) and not Robert Jones; (2) the rape victim's statement that the

perpetrator told her that the location where he raped her was his "neck of the woods," a critical fact given that the location was a block from where Lester Jones lived; (3) the fact that the investigating detectives concluded that Robert Jones and Lester Jones did not know each other, and that Lester Jones was responsible for all the crimes of which Robert Jones was convicted; (4) Lester Jones's possession of items stolen in each robbery; and (5) a memorandum by the trial prosecutor corroborating that Lester Jones and Robert Jones did not know each other.

ee. *Eddie Triplett*:  In 1998, Mr. Triplett was convicted of drug charges after the prosecution withheld from the defense a police report describing how officers stopped both Mr. Triplett and another person before arresting Mr. Triplett and releasing the other man.  This police report named the other man, not Mr. Triplett, as the person detained.  The police report refuted the police's testimony at trial that no other person besides Mr. Triplett was present at the scene.  Mr. Triplett was exonerated in 2011.

ff. *Cedric Dent*:  In 1999, Mr. Dent was convicted of second-degree murder after the prosecution withheld evidence, including the lead detective's notes revealing that there was a second eyewitness, and that this eyewitness's description of the shooter was not a match to Mr. Dent.  The notes also contradicted the detective's account in his police report about how Mr. Dent came to be a suspect in the case.  Finally, prosecutors failed to disclose four out of the six accounts provided by the original eyewitness, each of which differed.  Mr. Dent was exonerated in 2022.

184.    In addition, there are several cases from the 1970s and 1980s in which OPDA's conduct amounted to an admission of a *Brady* or *Napue* violation.  By way of example, the following are three such cases that predate Mr. Davis's conviction:

a.  *Johnny Ross*:  In 1975, Johnny Ross was convicted of aggravated rape.  In 1981 Mr. Ross's conviction was overturned in federal court on the basis of a joint motion; ODPA subsequently declined to retry Mr. Ross and filed a memorandum acknowledging that the prosecutor had failed to provide the defense with information regarding the perpetrator's blood type, which could have been used to exclude Mr. Ross as the perpetrator.

b.  *Bobbie Jean Johnson*:  In 1978, Ms. Johnson was convicted of first-degree murder. Subsequently, Ms. Johnson filed an application for post-conviction relief alleging, *inter alia*, *Brady* and *Napue* claims relating to the suppression of evidence implicating another suspect and revealing police misconduct, including handwritten police notes indicating a man admitted to police that he planted the murder weapon in Ms. Johnson's purse and documents disproving elements of Ms. Johnson's coerced confession.  In response, OPDA allowed her to plead to reduced charges in exchange for immediate release.

c.  *Calvin Duncan*:  In January of 1985, Calvin Duncan was convicted of first-degree murder.  Subsequently, Mr. Duncan filed an application for post-conviction relief alleging *Brady* claims relating to the suppression of police records and grand jury testimony containing prior inconsistent statements of a testifying eyewitness and a police report that impeached a police officer's testimony at trial.  In response,

OPDA entered into a plea agreement with Mr. Duncan, who was released on time served.

185.    Under the City's, the NOPD's, and the OPDA's policies, customs, and practices, officials were permitted and encouraged to refrain from making any record of *Brady* information, despite the fact that disclosure of such information was and remains constitutionally required. Through a policy, custom, and practice of not training employees regarding their *Brady* obligations, not disciplining employees for *Brady*, *Napue*, or other constitutional violations, and taking no remedial action in cases where such wrongdoing was discovered (through court decisions, post-conviction proceedings, or otherwise), the City, the NOPD, and the OPDA encouraged such violations by demonstrating to employees that they would face no negative consequences for their failures to comply with *Brady*, *Napue*, and other constitutional requirements.

186.    OPDA did, however, clearly communicate to prosecutors that they would face negative consequences for failures to obtain convictions.  OPDA tracked the win and loss records of its prosecutors (unlike the history of *Brady* violations, which were conspicuously not tracked), and these records went into prosecutors' individual personnel files.  This created a culture focused on "winning" at all costs and encouraged prosecutors to win by any means necessary (up to, and including, by ignoring *Brady* obligations).

187.    Taken together, the OPDA, NOPD, and City's policies, customs, and practices created a "pervasive culture of indifference to *Brady*," that fully infected the criminal justice system and directly caused Mr. Davis's wrongful conviction.  *Cf. Connick v. Thompson*, 563 U.S. 51, 73 (2011) (Scalia, J. concurring).

### 3. The City's and NOPD's Unlawful Policies, Customs, and Practices Concerning the Fabrication of Evidence

188.    At the time of Mr. Davis's arrest, prosecution, and conviction, the City and NOPD also created and/or maintained policies, customs, and practices that permitted and encouraged officials to fabricate evidence.

189.    Moreover, during the 1970s and 1980s, there was a pattern of fabrication of evidence within the NOPD.

190.    Individuals who were documented victims of the fabrication of evidence by the NOPD include the following:

a.  *Kevin Seward*:  In 1979, Kevin Seward was convicted of first-degree murder.  Mr. Seward's confession was allegedly given to the lead NOPD investigator and was introduced at trial over the objection of defense counsel.  Mr. Seward later challenged his conviction because his confession had been coerced by NOPD officers and detectives and should have been excluded at trial.  The Louisiana Supreme Court agreed and reversed Mr. Seward's conviction.  *State v. Seward*, 509 So. 2d 413 (La. 1987).

b.  *Darrell Land*: After subjecting Darrell Land to physical and verbal abuse during his wrongful arrest, NOPD Officers Reynolds and Duzac were indicted for lying to a grand jury.  Duzac was also indicted for willfully depriving Land of his civil rights and was found guilty on both counts.  Reynolds was acquitted.  *See United States v. Duzac*, 622 F.2d 911 (5th Cir. 1980).

c.  *John Floyd*:  In 1982, John Floyd was convicted of the 1980 murder of William Hines, who had apparently been murdered by a sexual partner.  Mr. Floyd's conviction was largely based on a confession entirely fabricated by NOPD officers

and detectives, which he signed while intoxicated and as a result of physical coercion and threats.  NOPD officers and detectives coerced two other witnesses into making statements implicating Mr. Floyd in the murder.  An NOPD detective also fabricated evidence regarding Mr. Hines' sexual preferences, falsely reporting that one of Mr. Hines' close friends related that Mr. Hines frequently had sexual relations with both white and Black partners when, in reality, that friend reported that he had only ever seen Mr. Hines with Black partners.  Mr. Floyd is white, and forensic evidence, including fingerprints and analysis of blood found at the scene, confirm that he was not the perpetrator.  Mr. Floyd petition for habeas corpus was granted in 2017 and he was released.

d.  *Raymond Flanks*: In 1985, Raymond Flanks was wrongfully convicted for a 1983 murder he did not commit.  Mr. Flanks was convicted at his second trial, after a jury was unable to reach a verdict in his first trial.  At this second trial, the government relied exclusively on the victim's wife's identification testimony, which an NOPD detective intentionally fabricated by using manipulative, grossly improper, and unlawful identification procedures designed to obtain an unreliable identification.  Among other misconduct, this detective responded to the victim's wife's expression of uncertainty about making an identification by shaking his head, directing her attention to Mr. Flanks's photograph, and saying, "that's him." He then denied doing so while testifying at Mr. Flanks's trial.  Mr. Flanks was exonerated in 2022.

e.  *Sullivan Walter*: In 1986, Sullivan Walter was wrongfully convicted for a rape he did not commit.  Before, during, and after his trial, the NOPD and OPDA concealed

and lied about critical exculpatory information, including scientific evidence that excluded Mr. Walter as the perpetrator of the crime and facts that could have helped Mr. Walter demonstrate the victim's misidentification of him.  Following discovery of the concealed scientific evidence—serological testing of semen from the perpetrator—Mr. Walter moved for a new trial in 1988.  At the hearing on this motion, an NOPD criminalist who had previously testified at trial changed his story to falsely say that the lab results did not necessarily exclude Mr. Walter as the perpetrator.  Relying on this contradictory testimony, the Criminal District Court denied Mr. Walter's motion for a new trial.  Mr. Walter was exonerated in 2022.

f.   *Joseph L. Greco*: The Louisiana Fourth Circuit Court of Appeal found that an NOPD detective and an OPDA investigator forced witnesses "to lie both in their pretrial statements and at trial," finding evidence the officers manufactured false testimony and coerced witnesses to present that false testimony at trial in 1988 and 1989.  *See State v. Greco*, 862 So.2d 1152 (La. Ct. App. 4th Cir. 2003).

191.   Supervisors at the NOPD were aware, or should have been aware, of NOPD officers' repeated fabrication of evidence and presentation of false evidence.  They nonetheless failed to discipline their employees, to provide additional training, or to otherwise ensure that they would not continue to fabricate and present false evidence.

192.   In addition to these cases, numerous other documented instances illustrate the City's, NOPD's, and OPDA's policies, customs, and practices of fabricating evidence and presenting false evidence at trial, including, but not limited to, in the above-described prosecutions of Issac Knapper, Curtis Lee Kyles, Jerome Morgan, Kuantau Reeder, Shareef Cousin, and Eddie Triplett.

## DAMAGES

193.    This action seeks damages for the period from June 21, 1983 (the date of Mr. Davis's detention as a suspect for the murder of Mr. Broussard) through the present.  Defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith, and/or malicious acts, misdeeds, and omissions caused Mr. Davis to be unfairly tried and wrongfully convicted; to endure over 40 years of wrongful imprisonment (including serving hard labor), including the physical and mental damage arising therefrom; and to spend his entire young adulthood bearing the burden and stigma of being falsely branded as a convicted murderer.

194.    Mr. Davis has spent most of his life wrongfully imprisoned.  He was arrested at the age of 24 for a heinous crime he did not commit, and he was sentenced to life imprisonment without the possibility of parole.  Mr. Davis's wrongful conviction and incarceration deprived him of the most vital years of his life, forcing him to spend those years in oppressive conditions, including performing forced prison labor.  His wrongful conviction denied Mr. Davis nearly every joy in life.

195.    Starting from the time he was only 24 years old, Mr. Davis served his sentence in harsh and oppressive conditions—including over years he spent at the Louisiana State Penitentiary, also known as Angola, a notoriously dangerous and abusive prison, particularly in the 1980s and 1990s.

196.    Due to his wrongful conviction and imprisonment, Mr. Davis lost his chance to have meaningful relationships with his family members and friends, including his children and grandchildren.  He also lost all the social benefits that come from freedom, including the opportunities to create community ties and participate in normal civilian life.

197.    The torment his family suffered exacerbated Mr. Davis own torment and the psychological burden he had to bear.

198.    As a direct and proximate result of the acts, misdeeds, and omissions of Defendants, the injuries and damages sustained by Mr. Davis, arising from the deprivation of his civil rights, include: the violations of his clearly established rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; personal injuries; past and future pain and suffering; past and future severe mental anguish; past and future emotional distress; extreme fear; economic damages including loss of income and diminution in future earning potential and the inability to obtain certain professional licenses; infliction of physical illness and injury resulting from his confinement; humiliation, indignities, embarrassment, degradation, and egregious injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal care, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

199.    All the alleged acts, misdeeds, and omissions committed by the individual Defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of the individual Defendants meets all the standards for imposition of punitive damages.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983

*Deprivation of Liberty Without Due Process of Law*
*(United States Constitution Amendments V and XIV)*

**Against the Individual Defendants**

200.    Mr. Davis repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

201.    The individual Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, improperly suppressed and failed to timely disclose material exculpatory evidence, fabricated evidence, and engaged in the affirmative concealment of such misconduct, thereby depriving Mr. Davis of his right not to be deprived of liberty without due process of law.

202.    Specifically, the individual Defendants failed to timely disclose material exculpatory evidence by failing to disclose information and records in NOPD's possession: (a) regarding inconsistent statements by witnesses, including Mr. Johnson and Mrs. Broussard; (b) regarding benefits received by testifying witness Mr. Johnson; (c) other information contained in police records that undermined testimony provided at trial, including by Defendant Winins and Mr. Ware; and (d) regarding physical evidence, including the gun used in the murder and the Mrs. Broussard's purse.

203.    The individual Defendants also fabricated evidence against Mr. Davis, including by falsely testifying at trial, fabricating a witness statement by Herman Bernard, and encouraging and failing to correct false testimony by witnesses at trial, including Defendant Winins, Mr. Johnson, and Mr. Ware.

59

204.    Had the individual Defendants' fabrications and/or the material exculpatory evidence known to them been disclosed, this evidence would have tended to prove Mr. Davis's innocence, cast doubt on the entire police investigation and prosecution, impeached key portions of testimony provided by Defendant Winins, Mrs. Broussard, Mr. Johnson, and Mr. Ware, and likely led to a more favorable outcome for Mr. Davis.

205.    The individual Defendants' misconduct did not cease with Mr. Davis's conviction, but continued up to the date of his exoneration, thereby prolonging his wrongful incarceration.

206.    The individual Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer or prosecutor at the time would have believed that the individual Defendants' actions were lawful.

207.    As a direct and proximate result of the individual Defendants' actions and omissions, Mr. Davis was wrongly prosecuted, detained, and incarcerated for over forty years and suffered the other grievous injuries and damages set forth herein.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983

*Engaging in Violations of Due Process that Shock the Conscience*
*(United States Constitution Amendment XIV)*

#### Against the Individual Defendants

208.    Mr. Davis repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

209.    In their determination to obtain Mr. Davis's conviction and incarceration irrespective of his innocence or guilt, the individual Defendants deliberately engaged in arbitrary and conscience-shocking conduct that contravened fundamental canons of decency and fairness and violated Mr. Davis's substantive due process rights under the Fourteenth Amendment.

210.     Specifically, the individual Defendants suppressed and failed to timely disclose material exculpatory evidence, fabricated evidence against Mr. Davis, engaged in the affirmative concealment of such misconduct, and engaged in additional, conscience-shocking misconduct that led to the wrongful incarceration of an innocent man.

211.     The individual Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer at the time would have believed that the individual Defendants' actions were lawful.

212.     As a direct and proximate result of the individual Defendants' actions, Mr. Davis was wrongly prosecuted, detained, and incarcerated for over forty years and suffered the other grievous injuries and damages set forth herein.

### THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983

*Malicious Prosecution and Denial of Fourth Amendment Rights*
*(United States Constitution Amendments IV and XIV)*

**Against the Individual Defendants**

213.     Mr. Davis repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

214.     The individual Defendants, acting individually and in concert, with malice, under color of law, and knowing that probable cause did not exist to arrest Mr. Davis and prosecute him for the murder of Mr. Broussard, caused Mr. Davis to be arrested, charged, and prosecuted for that crime, thereby violating Mr. Davis's clearly established right under the Fourth and Fourteenth Amendments to the United States Constitution to be free of unreasonable searches and seizures.

215.     Specifically, the individual Defendants: (a) failed to timely disclose exculpatory evidence, including but not limited to: (i) inconsistencies between Mr. and Mrs. Broussard's initial

accounts of the crime and Mrs. Broussard's trial testimony, (ii) records regarding the recovery of Mrs. Broussard's purse (and the purse itself), (iii) evidence impeaching testimony provided by Defendant Winins, Mr. Ware, and Mr. Johnson; (b) fabricated evidence by improperly influencing Mr. Ware and Mr. Johnson's implication of Mr. Davis, fabricating a false witness statement by Mr. Bernard, and, in Defendant Winins's case, providing false testimony; and (c) failed to correct witness statements they knew to be false or misleading.

216.    The individual Defendants engaged in this conduct without concern for or consideration of the perceived guilt or innocence of Mr. Davis, and for no purpose related to any legitimate law enforcement or prosecutorial concern.

217.    The individual Defendants' actions were in violation of clearly established constitutional law, and no reasonable officer at the time of Mr. Davis's prosecution or thereafter would have believed this conduct was lawful.

218.    Mr. Davis is, and has consistently maintained that he is, innocent of the murder of Mr. Davis.  The criminal proceedings terminated in Mr. Davis's favor when the Criminal District Court for the Parish of Orleans vacated his conviction and the State filed a nolle prosequi motion in Mr. Davis's case.

219.    As a direct and proximate result of the individual Defendants' malicious prosecution of Mr. Davis, Mr. Davis was wrongfully detained and incarcerated for over forty years for a crime he did not commit, and suffered the additional physical, emotional, and pecuniary damages as described herein.

## FOURTH CAUSE OF ACTION

### 42 U.S.C. § 1983

*Failure to Intervene*

### Against the Individual Defendants

220.     Mr. Davis repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

221.     By their conduct and under color of law, during the constitutional violations described herein, the individual Defendants stood by without intervening to prevent other Defendants and others yet unknown from violating Mr. Davis's constitutional rights, even though those individual Defendants had the opportunity to so intervene.

222.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Mr. Davis's clearly established constitutional rights.

223.     The individual Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer or prosecutor at the time would have believed the individual Defendants' actions were lawful.

224.     As a direct and proximate result of the individual Defendants' actions, Mr. Davis was wrongly prosecuted, detained, convicted, and incarcerated for over forty years and suffered the other grievous injuries and damages set forth herein.

## FIFTH CAUSE OF ACTION

### 42 U.S.C. § 1983

*Civil Rights Conspiracy*

### Against the Individual Defendants

225.    Mr. Davis repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

226.    The individual Defendants and others yet unknown agreed among themselves and other individuals to act in concert to deprive Mr. Davis of his clearly established rights not to be deprived of liberty without due process of law, and not to be illegally seized and detained.

227.    In furtherance of the conspiracy, the individual Defendants engaged in and facilitated numerous overt acts, including but not limited to the following:

      a.  acting in concert to conceal exculpatory evidence, including but not limited to: (i) inconsistencies between Mr. and Mrs. Broussard's initial accounts of the crime and Mrs. Broussard's trial testimony, (ii) records regarding the recovery of Mrs. Broussard's purse (and the purse itself), and (iii) evidence impeaching testimony provided by Defendant Winins, Mr. Ware, and Mr. Johnson;

      b.  acting in concert to fabricate evidence, including but not limited to false witness statements and testimony; and

      c.  acting in concert to affirmatively conceal such misconduct.

228.    As a direct and proximate result of the individual Defendants' conspiracy and actions in furtherance of that conspiracy, Mr. Davis was wrongly prosecuted, detained, convicted, and incarcerated for over forty years and suffered the other grievous injuries and damages set forth herein.

**SIXTH CAUSE OF ACTION**

**42 U.S.C. § 1983**

*Monell v. Department of Social Services*, 436 U.S. 658 (1978)

**Against Defendants the City of New Orleans; Jason Williams, *in his official capacity as Orleans Parish District Attorney*; and Anne Kirkpatrick, *in her official capacity as Superintendent of the New Orleans Police Department***

229. Mr. Davis repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

230. At all times relevant, Defendant the City of New Orleans and Defendants Williams and Kirkpatrick, in their official capacities, were responsible for the policies, customs, and practices of the NOPD and the OPDA.

231. The actions of each of the individual Defendants were undertaken pursuant to a policy, custom, and/or practice of the NOPD and/or the OPDA.

232. The NOPD's unlawful policies, customs, and/or practices included:

a. Suppressing and failing to timely disclose material exculpatory evidence; and

b. Fabricating evidence, including but not limited to false witness statements.

233. The OPDA's unlawful policies, customs, and/or practices included:

a. Suppressing and failing to timely disclose material exculpatory evidence; and

b. Knowingly using false testimony to obtain a conviction.

234. Before and during the unlawful investigation, prosecution, and incarceration of Mr. Davis, the City, and Defendants Williams and Kirkpatrick, by and through their final policymakers, maintained policies, customs, and/or practices of failing to adequately train, monitor, and supervise their employees regarding their constitutional duties to disclose exculpatory evidence, not to present false testimony, and not to fabricate evidence, despite the obviousness that such training, monitoring, or supervision was required in order to prevent

65

constitutional violations, and their awareness of prior incidents in which employees had failed to comply with these constitutional duties.

235.    The general practices of withholding exculpatory evidence, fabricating evidence, knowingly presenting false testimony to obtain a conviction, and failing to appropriately train, monitor, and supervise were so common and well established as to constitute official policies that fairly represented the City's and Defendants Williams's and Kirkpatrick's official policies, customs, and/or practices.

236.    Before and during the unlawful investigation, prosecution, and incarceration of Mr. Davis, the City, by and through its final policymakers, and Defendants Williams and Kirkpatrick also maintained a policy, custom, and/or practice of failing to supervise and discipline misconduct.

237.    The City's and Defendants Williams's and Kirkpatrick's final policymakers knew of these policies, customs, and practices, and implemented them with deliberate indifference to the likelihood that they would result in wrongful incarceration.

238.    The City's and Defendants Williams's and Kirkpatrick's policies, customs, and practices were a moving force behind the denial of due process to Mr. Davis in that they directly caused police and prosecutorial improprieties and errors, including suppressing and failing to timely disclose exculpatory material to the defense, and creating and presenting false testimony.

239.    As a result of these improprieties caused by the City's and Defendants Williams' and Kirkpatrick's policies, customs, and practices, Mr. Davis was subject to criminal proceedings that offend fundamental principles of justice and transgress any principle of fundamental fairness, including because he was prosecuted, convicted, and imprisoned as a direct result of intentional suppression of exculpatory information and the presentation of false testimony by NOPD and OPDA employees.

240.     The misconduct and constitutional violations committed by the individual Defendants in the course of the investigation and prosecution of Mr. Davis were carried out pursuant to these policies, customs, and/or practices of investigative misconduct, and were directly and proximately caused by the City's and Defendants Williams's and Kirkpatrick's failure to train, supervise, and discipline investigators.

241.     As a direct and proximate result of the City's and Defendants Williams's and Kirkpatrick's policies, customs, and/or practices, Mr. Davis was wrongly prosecuted, and continually detained for over forty years and suffered the other grievous and continuing injuries and damages as set forth herein.

<u>**SEVENTH CAUSE OF ACTION**</u>

**Malicious Prosecution**

*Louisiana State Law*

**Against the Individual Defendants**

242.     Mr. Davis repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

243.     The individual Defendants, acting separately and in concert, did willfully, unlawfully, maliciously, and without probable cause or legal justification, cause Mr. Davis to be prosecuted, detained, and incarcerated for the murder of Mr. Broussard.

244.     Specifically, the individual Defendants: (a) failed to timely disclose exculpatory evidence, including but not limited to: (i) inconsistencies between Mr. and Mrs. Broussard's initial accounts of the crime and Mrs. Broussard's trial testimony, (ii) records regarding the recovery of Mrs. Broussard's purse (and the purse itself), (iii) evidence impeaching testimony provided by Defendant Winins, Mr. Ware, and Mr. Johnson; (b) fabricated evidence by improperly influencing Mr. Ware and Mr. Johnson's implication of Mr. Davis, fabricating a false witness statement by

Mr. Bernard, and in Defendant Winins's case, providing false testimony; and (c) failed to correct witness statements they knew to be false or misleading.

245. The individual Defendants engaged in this conduct without concern for or consideration of the perceived guilt or innocence of Mr. Davis, and for no purpose related to any legitimate law enforcement or prosecutorial concern.

246. Mr. Davis is, and has consistently maintained that he is, innocent of the murder of Mr. Broussard.

247. The criminal proceedings terminated in Mr. Davis's favor when the Criminal District Court for the Parish of Orleans vacated his conviction and the State filed a nolle prosequi motion in his case.

248. As a direct and proximate result of the individual Defendants' malicious prosecution of Mr. Davis, Mr. Davis was wrongfully detained and incarcerated and served over forty years for crimes he did not commit, and suffered the additional physical, emotional, and pecuniary damages as described herein.

## EIGHTH CAUSE OF ACTION

### Wrongful Conviction and Wrongful Imprisonment

*Louisiana State Law*

### Against the Individual Defendants

249. Mr. Davis repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

250. The individual Defendants acting separately and in concert, individually and in their official capacities did willfully, unlawfully, maliciously, and without probable cause or legal justification, cause Mr. Davis to be prosecuted, convicted, and incarcerated for an ongoing and continuing basis lasting over forty years for a crime he did not commit.

251.    The individual Defendants intentionally, maliciously, and with reckless disregard for and deliberate indifference to his rights, suppressed and failed to timely disclose material exculpatory evidence, fabricated false evidence, and presented false argument and false facts to the court for the purpose of ensuring that Mr. Davis was detained, prosecuted, convicted, and incarcerated and to preclude judicial authorities from discovering the lack of probable cause for the prosecution and ongoing detention of Mr. Davis.

252.    As a direct and proximate result of the individual Defendants' wrongful imprisonment of Mr. Davis, Mr. Davis suffered the physical, emotional, and pecuniary damages as described herein.

## NINTH CAUSE OF ACTION

### Negligence and/or Gross Negligence

*Louisiana State Law*

**Against the Individual Defendants and Defendant City of New Orleans**

253.    Mr. Davis repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

254.    The individual Defendants and City of New Orleans failed to take due care, and instead were negligent and/or grossly negligent in suppressing and failing to timely disclose material exculpatory evidence to Mr. Davis and in fabricating evidence against Mr. Davis.

255.    It was foreseeable that, as a result of such negligence by the individual Defendants and City of New Orleans, Mr. Davis would be wrongfully detained and incarcerated, and in fact, Mr. Davis was wrongfully detained and incarcerated and served over forty years for a crime he did not commit, and suffered the additional physical, emotional, and pecuniary damages as described herein.

## TENTH CAUSE OF ACTION

**Intentional and/or Reckless Infliction of Emotional Distress**

*Louisiana State Law*

**Against the Individual Defendants**

256.    Mr. Davis repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

257.    The individual Defendants, acting separately and in concert, individually and in their official capacities, did intentionally, maliciously, and with reckless disregard and deliberate indifference to Mr. Davis's rights engage in extreme and outrageous conduct in connection with the detention, prosecution, conviction, and incarceration of Mr. Davis, including, without limitation, prosecuting Mr. Davis without probable cause; suppressing and/or failing to timely disclose material exculpatory evidence; fabricating false evidence; and presenting false argument and false facts to the court for the purpose of ensuring that Mr. Davis was indicted, detained, and incarcerated.

258.    The individual Defendants desired to inflict severe emotional distress on Mr. Davis or knew that severe emotional distress would be certain or substantially certain to result from their joint and several conduct.

259.    As a direct and proximate result of the individual Defendants' joint and several extreme and outrageous behavior, Mr. Davis suffered severe emotional distress for which he is entitled to damages.

## ELEVENTH CAUSE OF ACTION

### Vicarious Liability

*Louisiana State Law*

### Against Defendant the City of New Orleans

260.   Mr. Davis repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

261.   At all times, the individual Defendants were acting within the scope of their employment and as agents for the City of New Orleans.

262.   Consequently, the City of New Orleans is liable under the doctrine of *respondeat superior* for any and all tortious actions of its employees and agents.

## TWELFTH CAUSE OF ACTION

### Violations of the Louisiana State Constitution

*Louisiana State Law*

### Against the Individual Defendants and Defendant City of New Orleans

263.   Mr. Davis repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

264.   The Louisiana State Constitution, like the United States Constitution, guarantees a person's right to be secure in his person and effect from unreasonable seizure, to equal protection of the law, to due process of law, to be free from discrimination, to be free from cruel, excessive, or unusual punishment, and to additional unenumerated rights.  *See* La. Cost. Art. I, §§ 2, 3, 5, 12, 13, 15, 16, 20, 22, & 24.

265.   By reason of the same intentional, malicious, reckless, and deliberate conduct that violated Mr. Davis's rights under the United States Constitution, the individual Defendants and

the City of New Orleans's conduct violated the rights guaranteed to Mr. Davis under Article I, §§ 2, 3, 5, 12, 13, 15, 16, 20, 22, and 24 of the Louisiana State Constitution.

266.    These violations of the Louisiana State Constitution proximately and directly caused Mr. Davis to be wrongfully detained and incarcerated for a crime he did not commit, and suffer the additional physical, emotional, and pecuniary damages as described herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Jerry Davis demands judgment against the above-captioned Defendants as follows:

a.  for compensatory damages to be determined at trial, but in all events no less than $50 million;

b.  for punitive damages against the individual Defendants in an amount to be determined at trial;

c.  for reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. § 1988 and other applicable laws;

d.  for pre- and post-judgment interest as allowed by law; and

e.  for such other relief as this Court deems just and proper.

Dated:   July 26, 2024
         New Orleans, Louisiana


MURELL LAW FIRM                          SHANIES LAW OFFICE LLC


By: */s/ Christopher J. Murell*          By: _____

   Christopher J. Murell, La. Bar No. 32075       David B. Shanies* (T.A.)
   Meghan K. Matt, La. Bar No. 39975              Eleanor C. Davis*
   2831 Saint Claude Avenue                       110 West 40th Street, Tenth Floor
   New Orleans, Louisiana 70117                   New York, New York 10018
   (504) 717-1297 (Tel)                           (212) 951-1710 (Tel)
   chris@murell.law                               (212) 951-1350 (Fax)
   meghan@murell.law                              david@shanieslaw.com
                                                  eleanor@shanieslaw.com

                                                  * Application for admission *pro hac
                                                    vice* forthcoming.


                    *Attorneys for Plaintiff Jerry Davis*