## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JERRY DAVIS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 24-1870** |
| **CITY OF NEW ORLEANS, ET AL.** | **SECTION: "H"** |

## ORDER AND REASONS

Before the Court is Defendant Jason R. Williams's Motion to Dismiss for Failure to State a Claim (Doc. 20). For the following reasons, the Motion is **DENIED**.

## BACKGROUND

This case arises from the unconstitutional prosecution, conviction, and incarceration of Plaintiff Jerry Davis for the first-degree murder of John Broussard. Post-conviction efforts to challenge Plaintiff's conviction revealed that leading up to and during the trial, exculpatory evidence was suppressed, and false testimony was proffered without correction. Plaintiff was incarcerated for over forty years.

### A. The Crime

Late in the evening on May 6, 1983, Mr. Broussard and his wife parked their camper in a trailer lot in New Orleans East. While Mr. Broussard hooked up the camper to electricity, and his wife remained inside the camper, two Black men approached. Mr. Broussard said something to the men before he was shot by one of them. One of the men entered the camper and took Mrs. Broussard's purse before both men fled the scene on foot.

**B. The Broussards' Initial Statements and the Start of the Investigation**

New Orleans Police Department ("NOPD") Officers Docia LaGrange and Kenneth Maes arrived on the scene shortly after the shooting and saw Mr. Broussard lying on the ground with a gunshot wound to the chest. Before paramedics arrived, Officer LaGrange spoke to Mr. Broussard and took his account of the incident, which she recorded in an initial incident report. Officer LaGrange also recorded Mrs. Broussard's account of the incident.

According to Mr. Broussard, after the men approached him outside the camper, they began "demanding money" from him, and then one of the perpetrators "started to enter the camper." Mr. Broussard tried to stop the man from entering the camper "when the perpetrator shot him." In his account, as "the other perpetrator stayed outside," the first perpetrator who "was in possession of the weapon" then "entered the camper [and] demanded his wife's purse." Mrs. Broussard reported that, while inside the camper, she heard Mr. Broussard outside of the camper "talking to someone" before she "heard a shot." Mrs. Broussard then told the officers that "immediately after the shot," one of the perpetrators entered the camper "demanding her money and purse." Mrs. Broussard said that she gave her purse to the perpetrator in the camper. When paramedics arrived, they administered first aid to Mr. Broussard and transported him to Methodist Hospital where he was pronounced dead around 12:30 A.M.

Detective Melvin Winins of NOPD's Criminal Investigation Bureau was assigned to investigate Mr. Broussard's murder. After Mr. Broussard died, Detective Winins went to Methodist Hospital, where Officers LaGrange and Maes briefed him. After leaving the hospital the day after the shooting, Detective Winins attempted to visit the crime scene, but he "observed that the

lighting in this area was very poor." He concluded that he "could not locate a scene," nor "any evidence or witnesses."

### C. Eyewitnesses and Descriptions of the Suspects

Three days after the shooting, on May 9, 1983, Detective Winins spoke with Joseph Celino, who said he was parked across the street from where the Broussards were parked, sitting in his truck, when the shooting occurred. Mr. Celino explained that after hearing "what sounded like two gunshots," he "looked up" and "observed two Black males running from the trailer lot." Mr. Celino described the two men as twenty to twenty-five years old, one being "5 feet 8 inches tall, about 160 lbs.," and the other being "5 feet 9 inches tall, about 150 lbs." On June 6, 1983, Detective Winins and Detective Robert Lambert returned to the scene to canvass the area, when they spoke with another witness, Charles Cornish. Mr. Cornish, like Mr. Celino, described the suspects as one inch apart in height, twenty to twenty-three years of age, and 145 to 150 pounds.

On June 10, 1983, more than one month after the shooting, Mrs. Broussard visited the Homicide Office to view three sets of line-ups. Mrs. Broussard did not identify anyone as the perpetrator who entered her camper at that time. While it is unclear whether Detective Winins spoke with Mrs. Broussard at the hospital upon his initial visit or later[1], Detective Winins took

---

[1] According to daily reports completed by Detective Winins on June 6th and 10th of 1983, Detective Winins did not interview Mrs. Broussard about the crime until June 10, 1983, over one month after the crime. Detective Winins's daily reports indicate that when he attempted to interview Mrs. Broussard at the hospital, she was "not mentally able for an interview at this time." Detective Winins also reported that he attempted to interview Mrs. Broussard on May 10, 1983, but she told him she was occupied with funeral arrangements and ended the interview. Additionally, on both May 16, 1983, and May 18, 1983, Detective Winins again attempted to set an interview with Mrs. Broussard but received no response. According to a Supplemental Incident Report prepared by Detective Winins on June 21, 1983, however, Detective

a statement from Mrs. Broussard when she came in to view the photo line-ups. Mrs. Broussard told Detective Winins that she first heard her husband's voice outside, telling someone, "You can't go in there," after which she saw a "young Bl[a]ck man coming toward the back door of the camper." Mrs. Broussard described the perpetrator as five feet and ten inches to six feet tall, "medium complexioned," and about 160 to 170 pounds. Though she tried to hold the door closed, the man entered the camper, pushed her back, and grabbed her purse and wallet. The man then "turned around and was leaving out the door when [she] heard a shot." When Detective Winins asked whether the subject was armed, Mrs. Broussard said that she "never saw a weapon."

Mrs. Broussard's initial statements to the officers, and those made by her husband before his death, are inconsistent with those reflected in Detective Winins's June report; in the former, one of the men did not enter the camper until *after* her husband one shot and in the latter, one of the men was in the camper with her when the other man shot her husband.

## D. Investigation Evolves with the Help of a Confidential Informant

Later in June 1983, Detective Winins and another detective met with a confidential informant, Allen Johnson, who told them that he knew the two men involved in the murder because his friend, John Phillip Ware, had told him about the crime.[2] When detectives located Mr. Ware, Detective Winins told Mr. Ware he was a suspect in a murder and armed robbery, but that he knew that "Jerry [Davis] was the gunman, that Jerry [Davis] did the shooting."[3] Mr.

---

Winins spoke with Mrs. Broussard *at the hospital*, where she gave him an account of the crime and a list of property stolen from her.

[2] Johnson did not mention Jerry Davis's name when he spoke to police.

[3] Mr. Ware and Mr. Davis had previously been arrested together, which may explain where Detective Winins came up with Mr. Davis's name.

Ware then admitted to taking the purse but said that Plaintiff Jerry Davis was the gunman and that he would help the police "in any way that he could." The same day that officers spoke to Mr. Ware, he prepared a typewritten statement that included these admissions and detailed how he and Mr. Davis met up at a local elementary school to split the money from Mrs. Broussard's purse before leaving it behind in the cafeteria. After Mr. Ware gave his statement, Detective Winins arrested him for murder and armed robbery. Detective Winins then met with Mr. Davis, who was being held for unrelated charges. Mr. Davis refused to make any statement. The interview was terminated, and he was "re-booked in the Central Lock-up with the murder of John Broussard and also the armed robbery."

Mr. Johnson returned to give a statement the day after Detective Winins spoke with and arrested Mr. Ware. At that time, Mr. Johnson changed his story, telling Detective Winins that he heard about the crime from Mr. Davis, not Mr. Ware, whose own statement matched Mr. Johnson's. Mr. Johnson also told Detective Winins that Mr. Davis told him that the murder weapon was a pistol that he had stolen from a woman's pocketbook. When police recovered the murder weapon, the previous owner's story matched Johnson's.[4]

On June 23, 1983, Detective Winins went to the elementary school Mr. Ware mention in his report and recovered a purse that matched Mrs.

---

[4] According to Mr. Johnson, Mr. Davis "told [him] that the pistol they used was taken out of a ladies [sic] pocketbook which was in a pickup truck while she was getting gas," that the pickup truck was blue, and that the incident occurred "about one month before the murder" at "the Amoco station at Chef and Dale." When asked if Mr. Davis told him what he did with the murder weapon, Mr. Johnson stated that "he sold it to somebody, he didn't mention any name," and that "he said he didn't want to get caught with it." When police later recovered the murder weapon, the serial number matched a gun that had been reported stolen in April 1983. A woman had reported her Beretta .25 caliber pistol stolen from her "make-up bag inside [her] purse" from the gas station on Chef Menteur Highway and Reynes Street. Reynes Street runs parallel to Dale Street and intersects with Chef Menteur Highway one block west of Dale Street.

Broussard's description of the one taken the night of the murder. Detective Winins then reported that a crime lab technician who took photographs of the purse and surrounding area removed the purse and forwarded it to the Criminal Property and Evidence Room. Critically, while Detective Winins reported that he obtained a Crime Lab Report and attached it to the case file, no such report was recovered or turned over to the defense.

The following day, Detective Winins visited Mrs. Broussard in Mississippi to conduct a second photo line-up. Upon viewing a "six picture photographic line-up, which consisted of a picture of . . . [John] Phillip Ware," Mrs. Broussard positively identified Mr. Ware and advised Detective Winins that "there was no doubt in her mind that Mr. Ware was the man who had entered the camper the night her husband was killed and took her purse." (This meant that if Mrs. Broussard's later report that the man who entered the camper was in the camper with her when her husband was shot—and this man was Mr. Ware—the other man was the one who shot and killed Mr. Broussard.)

On July 5, 1983, Detective Winins was notified that Herman Bernard said that he was in possession of a gun that may have been used in the murder of Mr. Broussard. Detective Winins purportedly took a statement from Mr. Bernard wherein Mr. Bernard stated that his friend bought the gun from Mr. Davis three weeks prior—a little over one month after Mr. Broussard's murder. Mr. Davis was subsequently indicted for the first-degree murder of Mr. Broussard on July 7, 1983.

### E. Trial and Conviction

ADA James Williams was assigned to the case. After Mr. Davis was arraigned and entered a plea of not guilty in July 1983, his counsel filed an Application for Bill of Particulars requesting evidence "materially favorable" to him; statements of non-testifying witnesses, any deal made by NOPD or

District Attorney's office for testimony of the co-conspirator, and arrest and conviction records. In its answer to the defense's requests, the State answered that there was no evidence materially favorable to the defense; that the defense was not entitled to statements of non-testifying witnesses; and that any deal with the co-conspirator and any arrest and conviction records were "not applicable."

In January 1984, ADA Williams wrote a memorandum to the First Assistant District Attorney asking for a reduction in Mr. Ware's charge to manslaughter in exchange for his testimony, conceding that without Mr. Ware, the State would have to rely on the testimony of Mr. Johnson who was unreliable due to his "long criminal record." The First ADA consented, and Mr. Ware pleaded guilty to the charge of manslaughter on January 30, 1984, the same day that Davis went to trial.

During the trial, contradictions ensued. In his opening statement, ADA Williams said that Detective Winins did not have any information about the crime until Mr. Johnson pointed him to Mr. Ware and Mr. Davis, but this was not accurate. Detective Winins spoke to two eyewitnesses prior to meeting with Mr. Johnson—neither of whom testified. This omission is significant because both men described the perpetrators as being roughly one inch apart in height. Mr. Ware is six feet tall. Mr. Davis, on the other hand, is just five feet six inches tall. Further, when Mr. Johnson first came to the police, he said only that he knew Mr. Ware was responsible for the incident. Mr. Johnson did not mention Jerry Davis until *after* Mr. Ware had implicated Mr. Davis.

Then, during direct examination, Detective Winins testified that he met with Mrs. Broussard at the hospital the day after the shooting, but this contradicts his daily reports that stated that she was not well enough to speak that close to the murder. Detective Winins also misrepresented the timing of

when he first spoke to Mr. Johnson. Detective Winins testified that "approximately two weeks" after the incident, he returned to the scene to canvass the immediate area. Because of this canvassing and "speaking with Mrs. Broussard," Detective Winins stated that he had a possible suspect named by Mr. Johnson, but all written reports indicate that Detective Winins first spoke with Mr. Johnson on June 21, 1983—over a month and a half after the murder. Finally, Detective Winins also testified that he could not recover any physical evidence after Mr. Ware gave his statement, but this is refuted by the police reports detailing the recovery of Mrs. Broussard's purse from the elementary school. The purse was not introduced into evidence, nor was it turned over to the defense. The jury was never told that NOPD had recovered the purse.

Mrs. Broussard's account at trial of her interaction with the perpetrator in the camper also differed from her earlier statements, making it unclear whether the person who shot her husband was the same one who entered the camper and demanded that she hand over her purse. When Mr. Williams asked Mrs. Broussard if she ever saw Mr. Ware with a gun, and if he was "the man who shot [her] husband," Mrs. Broussard responded "no" to both. Mr. Broussard, however, stated in his dying declaration to police that the "perpetrator entering the camper was in possession of the weapon."

Mr. Johnson testified that he heard about the armed-robbery homicide from Mr. Davis, though he initially did not mention Mr. Davis's name until after Mr. Ware spoke to detectives and implicated Mr. Davis. Mr. Johnson also misrepresented his previous convictions when asked about them on the stand, only acknowledging a 1977 conviction for simple burglary and not three others

about which Williams knew but did not disclose to the jury.[5] ADA Williams was aware of Mr. Johnson's prior convictions, as evidenced in a memorandum mentioning them, but did not correct Mr. Johnson's testimony. ADA Williams then asked Mr. Johnson whether, "as a result of [his] testifying in this case, an obscenity charge, which [was] currently pending against [him], [would] be dropped." Mr. Johnson responded, "yes." While the charge was later dropped, neither the State nor Mr. Johnson disclosed to the defense or the jury that Mr. Johnson later received only a twelve-year suspended sentence and five years of probation for his burglary charge. This was a considerable deal that was struck after an ADA and the First ADA agreed that Mr. Johnson's information was vital to the break in the Broussard homicide case, and that Mr. Johnson "should be shown some leniency" and not be "multiple-billed" as a habitual offender.

Also, during his testimony, Mr. Ware did not disclose convictions other than the manslaughter charges to which he had just pleaded guilty.[6] Neither ADA Williams nor any other prosecutor or OPDA employee corrected the false testimony. During cross-examination, defense counsel asked Mr. Ware about his decision to speak to the police and implicate Mr. Davis. Mr. Ware said Detective Winins came to speak to him at his mother's house and told him that "he knew that [he] had participated in this crime, but he know [sic] that Jerry [Davis] was the gunman, that Jerry [Davis] did the shooting." Thus, Mr. Ware confirmed that it was not until *after* Detective Winins spoke to Mr. Ware on June 21, 1983 and told him that he "[knew] Jerry [Davis] was the gunman" that any witness implicated Mr. Davis.

---

[5] The first was a 1977 misdemeanor conviction for theft, and the second was a 1979 felony conviction for unauthorized use of a moveable. The third was a felony conviction for burglary in 1983, for which Mr. Johnson was still awaiting sentencing.

[6] At the time of Mr. Davis's trial, Mr. Ware had two prior convictions, one for escape in October of 1980 and one for battery in December of 1980.

In their closing statements, ADA Holly Taylor and ADA Williams misrepresented the timing of Mr. Johnson's help as related to the arrests of Mr. Ware and Mr. Davis[7], reiterated Mr. Johnson and Mr. Ware's trustworthiness; and denied NOPD's possession of Mrs. Broussard's purse or knowledge of its whereabouts.[8]

The jury ultimately found Mr. Davis guilty of first-degree murder.

### F. Post-Conviction Proceedings and New Evidence

Following his conviction, Plaintiff tried many different legal avenues for post-conviction relief.[9] On May 3, 1994, Mr. Davis received a copy of the NOPD file for the Broussard homicide, which included the Incident Report containing both Mr. and Mrs. Broussard's statements confirming that the perpetrator who entered the camper was the shooter; the daily reports written by Detective Winins containing witness descriptions of the perpetrators and Mr. Johnson's initial statement implicating Mr. Ware, not Mr. Davis; the typewritten statements of all testifying and non-testifying witnesses; and the memorandum written by Mr. Williams stating that he had knowledge of Mr. Johnson's "long criminal record," which was not disclosed at trial. None of these documents had previously been provided to Mr. Davis or his attorney.

In 2021, the Innocence Project of New Orleans ("IPNO") conducted a reinvestigation of Plaintiff's case. The reinvestigation yielded exculpatory evidence that had not been provided to the defense or presented to the jury, as well as Mr. Johnson's arrest and conviction history at the time of the investigation and prosecution. In 2022, Mr. Bernard, the man who possessed

---

[7] ADA Taylor claimed that Mr. Johnson provided both Mr. Ware's and Mr. Davis's names "prior to the arrest of either of those people," but that was not the case. Mr. Johnson only provided Mr. Ware's name—not Mr. Davis's name—prior to their arrests.

[8] In response to defense counsel's argument about the lack of physical evidence presented to the jury, Mr. Williams stated, "[w]e don't have the purse . . . the purse was dumped somewhere. It's probably incinerated by now."

[9] Doc. 1, ¶¶119–33.

the gun used to shoot Mr. Broussard, averred that he never gave a typewritten statement to the police. Subsequently, Plaintiff filed an Application for Post-Conviction Relief with the Orleans Parish Criminal Court seeking vacatur of his conviction and dismissal of the case against him. On July 26, 2023, a judge vacated Plaintiff's conviction and sentence due to the "breadth and severity of the *Brady* and *Napue* violations" that the court found.[10] On March 15, 2024, the State filed a nolle prosequi motion, terminating the case in Plaintiff's favor.

On July 26, 2024, Plaintiff filed suit in this Court against the City of New Orleans (the "City"), Anne Kirkpatrick in her official capacity as Superintendent of the New Orleans Police Department, Winins in his individual capacity, unidentified parties in their individual capacities, and Defendant Williams in his official capacity as Orleans Parish District Attorney. Defendant Jason Williams is the current OPDA, and as such, responsible for the operation, maintenance, and control of the OPDA and for the selection, training, supervision, and discipline of prosecutors and other OPDA employees. The Complaint asserts that Defendant Williams is successor as final policymaker for the OPDA to Harry Connick Sr., who served as OPDA's final policymaker from in or around 1974 to in or around 2003.[11]

Plaintiff brings a *Monell* claims against Defendant Williams in his official capacity as District Attorney for Orleans Parish. In his Complaint, Plaintiff alleges that "throughout the 1970s, 1980s, and 1990s, the OPDA maintained policies and customs that promoted, facilitated, and condoned misconduct by prosecutors and other OPDA employees and agents, including concerning the suppression of exculpatory and favorable evidence to criminal defendants and their counsel and the knowing use of false evidence to secure

---

[10] *Id.*, ¶132.
[11] Doc. 1, ¶22.

convictions."[12] Plaintiff further alleges the OPDA's policymakers maintained a policy, custom, or pattern and practice of condoning official misconduct, including by failing to train, supervise, and discipline prosecutors about the constitutional obligations to the defendants.

On October 20, 2024, Defendant Williams filed the instant Motion to Dismiss for Failure to State a Claim. Plaintiff opposes.[13]

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough facts "to state a claim to relief that is plausible on its face."[14] A claim is "plausible on its face" when the pleaded facts allow the court to "[d]raw the reasonable inference that the defendant is liable for the misconduct alleged."[15] A court must accept the complaint's factual allegations as true and must "draw all reasonable inferences in the plaintiff's favor."[16] The Court need not, however, accept as true legal conclusions couched as factual allegations.[17]

To be legally sufficient, a complaint must establish more than a "sheer possibility" that the plaintiff's claims are true.[18] "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" will not suffice.[19] Rather, the complaint must contain enough factual

---

[12] Doc. 1, ¶149.

[13] Doc. 25. Since filing these pleadings, Plaintiff has filed two Notices to the Court that include recent Orders and Reasons from other judges in this district ruling on to Defendant Williams' motions to dismiss in their respective cases where similar actions are pending. Docs. 29 & 32. Defendant Williams filed a response only to the Notice regarding *Flanks v. City of New Orleans*, No. 23-cv-6897 (E.D. La. Feb. 28, 2025). Doc. 30.

[14] Ashcroft v. Iqbal, 556 U.S. 662, 667 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 547 (2007)).

[15] *Id.*

[16] Lormand v. U.S. Unwired, Inc., 565 F.3d 228, 232 (5th Cir. 2009).

[17] *Iqbal*, 556 U.S. at 667.

[18] *Id.*

[19] *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).

allegations to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim.[20]

## LAW AND ANALYSIS

In his Complaint, Plaintiff seeks to hold Defendant Jason Williams liable in his capacity as District Attorney for the City of New Orleans under *Monell v. Department of Social Services*[21] in violation of 42 U.S.C. § 1983. Specifically, Plaintiff alleges that "[p]rior to, during, and after [his] wrongful conviction, OPDA supervisors and policymakers had actual and constructive notice of a pattern and practice of prosecutors' *Napue* and *Brady* violations" such that "when confronted with instances of misconduct, including in particular *Napue* and *Brady* violations, OPDA's supervisors and policymakers, as a matter of policy and custom, failed to impose reasonable discipline on the employee(s) involved and failed to take other reasonable, remedial measures to deter and prevent such misconduct."[22] Plaintiff also includes public statements made by Connick acknowledging *Brady* violations but failing to address them and describes a culture at the OPDA's office of winning at all costs. Plaintiff further alleges that this "complete failure to train, supervise, and discipline employees regarding their *Brady* obligations predictably led to repeated *Brady* violations" such as the ones that occurred in his own case.[23]

Plaintiff also provides empirical data to support his conclusion that "concealing exculpatory evidence in New Orleans was routine" during the relevant time, stating that "Orleans Parish has the highest per capital exoneration rate of any county or parish in the country."[24] Plaintiff's Complaint

---

[20] *Lormand*, 565 F.3d at 255–57.
[21] 436 U.S. 658 (1978).
[22] Doc. 1, ¶150.
[23] *Id.*, ¶175.
[24] *Id.*, ¶179, 180.

includes numerous other instances of *Brady* violations during the relevant time, as well as commentary by Supreme Court Justices John Paul Stevens and Ruth Bader Ginsburg who observed "that the OPDA's violations were 'blatant and repeated'" and "that the OPDA during the 1980s was 'a tinderbox . . . in which *Brady* violations were nigh inevitable.'"[25] Plaintiff also attached to the Complaint an expert report prepared by Professor Laurie L. Stevenson which discusses the extent to which the policies, customs, and practices of the OPDA regularly failed to comply with *Brady*.

## I.    Municipal Liability

Section 1983 authorizes suits for damages against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."[26] "In *Monell*, the Supreme Court held that a governmental entity is liable under § 1983 only when the entity itself caused the constitutional violation at issue."[27] "Municipalities, which include counties and certain other local governmental bodies, are 'persons' under Section 1983."[28] However, it is well settled that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983."[29] To state an official capacity claim against a municipality, Plaintiff must allege that "(1) an official

---

[25] *Id.*, ¶179 (quoting Connick v. Thompson, 563 U.S. 51, 108 (2011) (Ginsburg, J., dissenting)). This Supreme Court case considered *Brady* violations during the tenure of the same Harry Connick, Sr. ("Connick") to whom Defendant Williams has succeeded as OPDA.

[26] 42 U.S.C. § 1983.

[27] Moses v. City of New Orleans, No. 24-1768, 2025 WL 816296, at *5 (quoting *Monell*, 436 U.S. at 694).

[28] Daves v. Dallas Cnty., 22 F.4th 522, 532 (5th Cir. 2022).

[29] Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989).

policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right."[30]

"Under *Brady*, a local government entity, including a district attorney's office . . . deprives a criminal defendant of his right to due process when it suppresses or withholds evidence that is both favorable to the defendant and material to his defense."[31] "A § 1983 *Brady* claim brought against the district attorney in his or her official capacity is treated as a suit against the state because the governmental entity is the real party in interest, and such claims are analyzed under the *Monell* doctrine."[32]

"In *Napue v. Illinois*, the United States Supreme Court 'held that a prosecutor's knowing use of, or deliberate failure to correct, perjured testimony, violates a defendant's Fourteenth Amendment rights.'"[33] "To successfully allege a *Napue* claim, a party must demonstrate that '(1) the testimony was actually false; (2) the state knew it was false; and (3) the testimony was material.'"[34]

Defendant avers that Plaintiff has not adequately alleged any of the elements required to hold OPDA liable under *Monell*.[35] Plaintiff responds that he has alleged facts sufficient to support *Monell* liability against Defendant Williams under two distinct theories: (1) that OPDA maintained an unconstitutional custom driven by a "pervasive culture of indifference to

---

[30] Peterson v. City of Fort Worth, 588 F.3d 838, 847 (5th Cir. 2009).

[31] Truvia v. Connick, 577 F. App'x 317, 321-22 (5th Cir. 2014).

[32] *Moses*, 2025 WL 816296, at *13 (citing *Truvia*, 577 F. App'x at 322).

[33] Walter v. New Orleans, et al., No. 23-cv-4352, R. Doc. No.64, at 13 (quoting Spence v. Johnson, 80 F.3d 989, 996 (5th Cir. 1996).

[34] *Id.* (quoting Devoe v. Davis, 717 F. App'x 419, 426 (5th Cir. 2018)).

[35] To the extent that Defendant argues about the validity of Plaintiff's underlying constitutional claims, the Court adopts the analysis and conclusions from *Walter v. New Orleans, et al.* wherein Judge Morgan found that the plaintiff bringing similar claims against Williams and OPDA adequately pleaded constitutional violations underlying his Monell claims. *See Walter*, Case No. 23-cv-4352, R. Doc. 64 at 11–15.

*Brady*" and *Napue*; and (2) that Mr. Connick, having knowledge of multiple instances in which OPDA prosecutors suppressed material exculpatory evidence and presented false testimony, fostered practices constituting deliberate indifference toward *Brady* and *Napue* violations.[36] The Court will consider each issue in turn.

### A. *Brady* & Suppressed Evidence

#### i.    Policymaker

"First, the district attorney is the policymaker for the OPDA, and [Plaintiff] identifies Connick as the OPDA at the time he was prosecuted and convicted."[37]

#### ii.    Custom, Notice, and Deliberate Indifference

An "[o]fficial policy is ordinarily contained in duly promulgated policy statements, ordinances or regulations."[38] Such an official policy is promoted "by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policymaking authority."[39] When determining *Monell* liability, "[a]n official policy may also be a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy and practically ha[s] the force of law."[40] Showing that such a custom, or "pattern of abuses that transcends the error made in a single case," was in place "requires similarity

---

[36] In his Opposition, Plaintiff notes that in the instant Motion, Defendant Williams did "not dispute that Plaintiff has alleged a constitutional violation, nor that Connick is the official policymaker responsible for OPDA's unconstitutional policies and customs." Doc. 25 at 18 n.7.

[37] *Id.* at *7.

[38] Piotrowski v. City of Houston, 237 F.3d 567, 579 (5th Cir. 2001).

[39] York v. Welch, No. 20-40580, 2024 WL 775179, at *3 (5th Cir. Feb. 26, 2024) (quotation and alteration omitted).

[40] *York*, 2024 WL 775179, at *3 (quotation and alteration omitted).

and specificity; prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question."[41] "The pattern of similar and specific acts also 'must be comprised of sufficiently numerous prior incidents rather than merely isolated instances.'"[42] Further, "[a] policymaker with policy-making authority must have actual or constructive knowledge of the custom."[43]

 "Plausibly to plead that a practice is so persistent and widespread as to practically have the force of law, a plaintiff must do more than describe the incident that gave rise to his injury."[44] "A plaintiff's description of the challenged practice cannot be conclusory; it must contain specific facts."[45] "[T]hose specific facts must be similar to the case at hand: 'Prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question.'"[46]

"A claim of a violation of section 1983 pursuant to . . . a persistent, widespread practice of city officials or employers—may in an appropriate case also encompass allegations that a policymaker failed to act affirmatively, including a failure adequately to train a subordinate."[47] To find *Monell* liability, such a custom "must be either unconstitutional or adopted with deliberate indifference to the known or obvious fact that such constitutional violations would result."[48] "Deliberate indifference is established by showing 'a

---

[41] Benfer v. City of Baytown, 120 F.4th 1272, 1286 (5th Cir. 2024)

[42] *Moses*, 2025 WL 816296, at *6 (quoting *Benfer* at 1286).

[43] Flanks v. City of New Orleans, No. CV 23-6897, 2025 WL 660037, at *8 (E.D. La. Feb. 28, 2025) (citing Webster v. City of Houston, 735 F.2d 838, 842 (5th Cir. 1984)).

[44] Johnson v. Harris Cnty., 83 F.4th 941, 946 (5th Cir. 2023) (internal quotation omitted).

[45] *Id.* (internal quotation removed).

[46] *Id.* (quoting Martinez v. Nueces Cnty., 71 F.4th 385, 389 (5th Cir. 2023) (cleaned up).

[47] Burge v. St. Tammany Parish, 336 F.3d 363, 369 (5th Cir. 2003).

[48] Blanchard-Daigle v. Geers, 802 F. App'x 113, 116 (5th Cir. 2020) (quotation omitted).

pattern of similar violations arising from a policy so clearly inadequate as to be obviously likely to result in a constitutional violation.'"[49]

"In *Connick v. Thompson*, the Supreme Court recognized that '[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of §1983.'"[50] "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."[51] As such, "[t]o satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'"[52] "Only then 'can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.'"[53] "Because '[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action[,]' the governmental entity may be deemed deliberately indifferently[*sic*] only when the 'policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights [and the policymakers] choose to retain that program.'"[54] "The city's 'policy of inaction' in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution."[55] "A

---

[49] *Moses*, 2025 WL 816296, at *6 (quoting Covington v. City of Madisonville, 812 F. App'x 219, 225 (5th Cir. 2020)). "Mere negligence, even gross negligence, is not sufficient to establish deliberate indifference." *Covington*, 812 F. App'x at 225.

[50] *Moses*, 2025 WL 816296, at *6 (quoting *Connick*, 563 U.S. at 61 (2011)).

[51] *Connick*, 563 U.S. at 61.

[52] *Id.* (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)).

[53] *Id.* (quoting *Canton,* 489 U.S. at 388)).

[54] *Moses*, 2025 WL 816296, at *6 (quoting *Connick*, 563 U.S. at 61).

[55] *Id.* (quoting *Connick*, 563 U.S. at 61–62).

pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train."[56] Also, "[p]olicymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the deliberate indifference – necessary to trigger municipal liability."[57]

Defendant argues that Plaintiff does not adequately allege that OPDA maintained an unconstitutional written policy regarding *Brady* at all or that Connick, the District Attorney at the relevant time, was deliberately indifferent to a practice of such violations within OPDA. Plaintiff does not argue with Defendant's statement that Plaintiff did not allege a formal, written policy of violating *Brady* existed, asserting instead that OPDA had a "'persistent, widespread practice' of withholding exculpatory evidence and knowingly presenting false evidence in violation of the Fifth and Fourteenth Amendment that was 'so common and well settled as to constitute a custom that fairly represents municipal policy.'"[58]

To show that this custom of similar constitutional violations to those he alleged in his Complaint—namely, "withholding exculpatory evidence, fabricating evidence, knowingly presenting false testimony to obtain a conviction, failing to appropriately train, monitor, and supervise"[59] — existed and that Connick had actual or constructive knowledge of it, Plaintiff cites cases that he characterizes as ones involving "[o]ther individuals who were documented victims of the *Brady* and *Napue* violations rampant in New

---

[56] *Id.* (quoting *Connick*, 563 U.S. at 62).

[57] *Id.* (quoting *Connick*, 563 U.S. at 62).

[58] Doc. 25 at 18 (citing Marshall v. Webre, No. 23-1319, 2023 WL 5952645, at *11 (E.D. La. July 25, 2022)).

[59] Doc. 1, ¶235.

Orleans in the 1970[s], 1980s, and 1990s."[60] Defendant argues that most of these cases are irrelevant because only prior court findings or admissions of *Brady* violations in very similar cases can provide the notice necessary to show deliberate indifference by OPDA's policymaker. Plaintiff responds that these allegations—combined with others regarding exoneration rates, the incorporated report from Professor Laurie L. Levenson, and Supreme Court justices' observations about routine concealment of exculpatory evidence in New Orleans—"illustrate persistent, widespread customs that evince a 'pervasive culture of indifference to *Brady'* and *Napue*."[61]

"Guidance from appellate courts on how many cases are enough to prove a custom and notice to the policymaker is sparse."[62] In his Complaint, Plaintiff cites more than 30 convictions obtained by OPDA prosecutors in which a *Brady* violation was subsequently found. The earliest conviction in those cases was in 1967, with at least 18 of those convictions occurring in the 16 years preceding Plaintiff's conviction in 1983.[63] Here, adopting Judge Brown's analysis in *Flanks v. the City of New Orleans*, the Court finds that "[a]t this motion-to-dismiss stage, this listing constitutes a plausible allegation that the OPDA had a custom of nondisclosure of favorable evidence, as would violate *Brady*, with Connick on constructive or actual notice of such violations—including the need to train, supervise, and discipline prosecutors—as to reflect his deliberate indifference."[64]

---

[60] *Id.*, ¶183.

[61] Doc. 25 at 20 (quoting *Connick*, 563 U.S. at 73 (Scalia, J., concurring)).

[62] *Flanks*, 2025 WL 660037, at *10.

[63] Plaintiff provides the exoneration date for 8 of those 18 cases.

[64] *Moses*, 2025 WL 816296, at *7 (citing *Flanks*, 2025 WL 660037, at *8–10). Defendant relies on *Verastique v. City of Dallas* to assert that *Flanks'* conclusion should not be adopted here because without certain "contextual factors" such as "department size" or "number of arrests," "it is *impossible* to identify the existence of a pattern—much less one that imparts constructive notice." Notice Reply, Doc. 30 at 2 (quoting *Verastique*, 106 F.4th at 343). The Court agrees with *Moses* and *Flanks* in their conclusions that "the *Brady* violations identified

### iii.    Moving Force

"The 'moving force' element of *Monell* liability requires a plaintiff to 'show municipal action was taken with the requisite degree of culpability and demonstrate a direct causal link between the municipal action and the deprivation of federal rights.'"[65] "[T]o survive a motion to dismiss, 'a complaint's description of a policy or custom and its relationship to the underlying constitutional violation cannot be conclusory; it must contain specific facts.'"[66] Critically, "[t]he causal link 'moving force' requirement and the degree of culpability 'deliberate indifference' requirement must not be diluted, for 'where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.'"[67] Still, "'[w]here a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so,' the causation determination 'is straightforward.'"[68]

Defendant asserts that Plaintiff does not adequately allege that OPDA's policies were the "moving force" causing the alleged suppression of evidence in his case because he failed to "adequately allege that the prosecutor or prosecutors responsible for the disclosures in his criminal case were acting pursuant to such a policy when they allegedly failed to disclose information and records in NOPD's possession."[69] Plaintiff argues that he has shown deliberate indifference by OPDA's policy maker in his Complaint by referring to: a significant number of other instances of *Brady* violations during the

---

by [Plaintiff] as occurring during Connick's tenure" were numerous and detailed enough to show a custom. *See Moses* at *7 (citing *Flanks* at *10–11).

[65] *Id.* at *7 (quoting *York*, 2024 WL 775179, at *3).

[66] *Id.* (quoting *York*, 2024 WL 775179, at *3).

[67] *Covington*, 812 F. App'x at 225–26 (5th Cir. 2020) (quoting Alvarez v. City of Brownsville, 904 F.3d 382, 390 (5th Cir. 2018)).

[68] Jauch v. Choctaw Cnty., 874 F.3d 425, 436 (5th Cir. 2017) (citation omitted).

[69] Doc. 20-1 at 16.

relevant time; public statements made by Connick wherein he acknowledged *Brady* violations but did not address them; a description of OPDA's culture of winning at all costs; OPDA practices of allowing attorneys to not investigate whether they obtained information that was favorable to the defendant; not disciplining attorneys that failed to comply with *Brady*; and a failure to train attorneys regarding their ethical and constitutional obligations. Plaintiff responds that because he has alleged that OPDA's unconstitutional policies caused his constitutional injury, he has met the causation requirement of the "moving force" element.[70] The Court agrees with Plaintiff—and both *Flanks* and *Moses*—that the number of *Brady* violations during Connick's tenure that he alleged in his Complaint, "when combined with Connick's alleged disdain for *Brady*, would satisfy the requisite causal link between the policy and the deprivation of federal rights."[71] Accordingly, Plaintiff has stated enough facts at this motion-to-dismiss stage, to allege that the OPDA's policy or practice was the moving force behind the alleged constitutional violation.

Considering the above, the Court finds that Plaintiff has alleged sufficient facts to state a *Monell* claim against Williams, in his official capacity as the current OPDA, for *Brady* violations.

### B. *Napue* & False Testimony

Defendant Williams argues that Plaintiff's Complaint is "entirely devoid of any factual allegations suggesting that OPDA ever had, or its prosecutors ever followed, an official policy of knowingly presenting false evidence at trial."[72] He asserts that Plaintiff fails to show that OPDA knowingly presented false evidence in any case and that OPDA policymakers were "[r]epeatedly . . . confronted with instances of misconduct, including in particular *Napue* . . .

---

[70] Doc. 25 at 29.
[71] *Moses*, 2025 WL 816296, at *7 (citing *Flanks*, 2025 WL 660037, at *12).
[72] Doc. 25 at 17.

violations."[73] As such, Defendant Williams argues that Plaintiff can show no pattern, policy, or custom of *Napue* violations in OPDA. Plaintiff opposes, arguing that he has sufficiently alleged enough other *Napue* violations to show a pattern.

In his Complaint, Plaintiff alleges that Winins' testimony regarding the timeline of his investigation of Mr. Broussard's murder was inconsistent with his previous reports and that Defendant Williams did not correct Ware's or Johnson's false testimony regarding their criminal history. Plaintiff connects these allegations to his assertion that OPDA had an unlawful policy, custom, and/or practice of knowingly using false testimony to obtain a conviction. In his response to Defendant Williams' Motion, Plaintiff cites to ten cases that he claims involve the failure to correct false testimony contradicted by inter-office memoranda prepared by a prosecutor before trial, the failure to correct testimony contradicted by undisclosed police records, and other failures to correct obviously false testimony in violation of *Napue*.[74]

"[D]istrict courts throughout the Fifth Circuit have held that while a plaintiff must do more than generically restate the elements of municipal liability, 'only minimal factual allegations should be required at the motion to dismiss stage,' given that many of the details would only be available through discovery."[75] The Court finds that, at this motion to dismiss stage, Plaintiff has sufficiently alleged facts to demonstrate the nature of the false testimony in those cases and their similarity to the instant case. As such, for reasons similar to those stated as to the *Brady* violations, the Court finds that Plaintiff has pleaded factual allegations demonstrating that OPDA committed *Napue*

---

[73] Doc. 1, ¶150.

[74] Doc. 25 at 21.

[75] Alanis-Mejia v. Cameron Cnty., No. 1:23-cv-40, 2023 WL 4109784, at *13 (S.D. Tex. May 17, 2023) (collecting cases).

violations under *Monell* by failing to correct perjured testimony, resulting in a violation of his constitutional rights.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion to Dismiss for Failure to State a Claim is **DENIED.**

New Orleans, Louisiana, on this 3rd day of July, 2025.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**